[No. B146867. Second Dist., Div. Four. Oct. 15, 2003.]

POUR LE BEBE, INC., Plaintiff and Appellant, v.
GUESS? INC., Defendant and Respondent.

[No. B146876. Second Dist., Div. Four. Oct. 15, 2003.]

GUESS? INC., Plaintiff and Respondent, v.
POUR LE BEBE, INC., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III and IV.

## COUNSEL

Fagelbaum & Heller, Philip Heller and Jerold Fagelbaum for Plaintiff and Appellant.

O'Melveny & Myers, Daniel M. Petrocelli, Robert C. Welsh and David J. Marroso for Defendant and Respondent.

## OPINION

**CURRY, J.**—Appellant Pour Le Bebe (PLB) seeks reversal of trial court orders confirming an arbitration award and denying PLB's petition to vacate the award. The parties' dispute revolved around a series of "license agreements" under which PLB was granted the right to utilize the trademarks of respondent Guess?, Inc. (Guess), at first in the manufacture and sale of infant's and children's clothing and accessories, and later in the manufacture and sale of home furnishings. Guess claimed that PLB had failed pay royalties required under the agreements. PLB asserted a number of counterclaims in the arbitration, including a claim that the licenses had been wrongly terminated by Guess and that the licenses represented illegal franchises. In addition, PLB sought to disqualify Guess's counsel, Daniel Petrocelli and the law firm of Mitchell, Silberberg & Knupp (MSK) from representing Guess in the arbitration. The panel rejected these claims.

On appeal, PLB contends: (1) Guess attained the award by undue means as a result of its representation by conflicted counsel; (2) the arbitrators exceeded their authority by deciding a statute of limitations issue exempted from arbitration by the parties' agreements; and (3) the award cannot be enforced because the contracts from which it arose were illegal and void *ab initio*. For the reasons set forth herein, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Parties' Agreements*

### 1. *License Agreement*

PLB entered into a "License Agreement" with Guess in 1992. Under the agreement, Guess granted PLB "the exclusive right to use the Guess Marks

and related Design Rights solely in connection with the manufacture and sale of the Products [defined elsewhere in the agreement essentially as clothing and accessories for babies, boys, and girls] in the Territory [also defined in the agreement] in accordance with the provisions of this Agreement." Guess retained the right to manufacture and sell "the Products" under the marks "in any area of the world other than the Territory" and to manufacture and sell products of any and all types and descriptions other than "the Products."

Section 19.1 of the agreement stated: "Except as provided, all disputes, controversies or claims arising out of or relating to this Agreement (including any extensions or modifications) or its interpretation, or concerning the respective rights or obligations of the parties . . . shall be settled and determined by arbitration only in Los Angeles, California in accordance with the Commercial Arbitration Rules of the American Arbitration Association . . . ." Section 19.6 provided: "Any claim is barred and waived unless the claimant institutes arbitration proceedings prior to the date when any action in court would be barred by the statute of limitations. The failure to institute arbitration proceedings prior to the expiration of the applicable statute of limitations constitutes an absolute bar to the institution of any arbitration or other proceeding by either party. All issues relating to the statute of limitations barring or preventing the commencement of proceedings shall be determined in court proceedings as described in Section 19.4, and the Arbitrators shall not have power or jurisdiction to determine such issues."

The "initial term" of the agreement was from November 1, 1992, to October 31, 2002, with an option to renew granted to PLB for a second 10-year term. Paragraph 13 permitted termination for material breach, with a right to cure for the defaulting party under certain circumstances, and for failure of PLB to reach minimum net sales as set forth elsewhere in the agreement, among other things.

## 2. Store License Agreement

In August 1993, Guess and PLB entered into an agreement entitled "Store License Agreement." The 1993 agreement contained a nearly identical arbitration provision, including the provision relating to statute of limitations, and also stated somewhat redundantly: "Any controversy or claim arising out of or relating to this Agreement, or the interpretation or breach of it, including any modification or extension, shall be settled by arbitration in Los Angeles County, California in accordance with the Commercial Arbitration Rules of the American Arbitration Association and California Code of Civil Procedure." There were also provisions similar to those in the 1992 License Agreement with respect to term, termination, and renewability.

### 3. *Home Furnishings License Agreement*

In March 1994, Guess and PLB entered into a "License Agreement . . . for Home Furnishings." This had a three-year term with an option to renew for an additional seven years. The termination provision was similar to the one in the 1992 License Agreement, as was the arbitration provision. For purposes of this agreement, products were defined as home furnishings, including bath and table linens, bath and table accessories, and bath robes.

### 4. *Retail Store License Agreement*

In July 1994, Guess and PLB entered into a "Retail Store License Agreement . . . for Home Furnishings." This agreement was also for a three-year term with a seven-year option to renew. It, too, contained termination and arbitration provisions similar to those set forth in the other agreements.

### *Arbitration Claim and Counterclaim*

In 1998, a dispute arose between the parties. On May 21, 1999, Guess filed a demand for arbitration. The demand stated that PLB had defaulted on its obligation to pay royalties and that Guess had given notice to PLB on May 14, 17, and 19, 1999, that the licenses had terminated. Guess was represented by Petrocelli and MSK.

In July 1999, PLB filed a counterdemand claiming that although the asserted basis for the termination and dispute was arrearages in royalty payments, Guess had accepted late payments in the past. PLB alleged that Guess wanted to take control of PLB's business by destroying PLB's financial viability. PLB further charged that the agreements were illegal franchises. Also included in the counterdemand were counterclaims for intentional interference with contractual relations, intentional interference with prospective economic advantage, unlawful business practices, unfair competition, and fraud. PLB sought, among other things, disgorgement of all royalties, fees, and other payments made to Guess since 1984.

### *Attempts to Disqualify MSK*

### 1. *Motion to Disqualify Presented to Panel*

In June 1999, Guess successfully obtained withdrawal of PLB's counsel (the firm of Alschuler, Grossman, Stein & Kahan) due to an alleged conflict of interest.

In December 1999, PLB's newly retained counsel filed a motion to disqualify MSK from representing Guess. PLB claimed that MSK was concurrently representing PLB in other matters and/or that MSK's past representation of PLB resulted in disclosure of confidential information substantially related to the issues raised in the arbitration. With respect to former matters, PLB pointed to: (1) the case of *Ready v. Benasra et al.*, (L.A. Super. Ct. case No. BC169021), a sexual harassment claim against Benasra, PLB, and others; (2) In re Guess?, Inc. and Jet Tech, Inc., an arbitration in which MSK jointly represented Guess and PLB; and (3) immigration matters in which MSK had represented key PLB employees, including its CEO Michel Benasra, its president Denys Goulin, and members of their families. With respect to current matters, PLB pointed to the fact that just days before the arbitration commenced, on May 6, 1999, an MSK attorney had sent a letter to the Immigration and Naturalization Service (INS) on Benasra's behalf.

PLB further pointed to the fact that in May 1997, MSK through Petrocelli had requested a conflict waiver acknowledging that MSK could "represent Guess (or any of its affiliated persons or entities) against [PLB] even if [it had] acquired confidential information from [PLB] relating to the subject matter of the dispute(s) between Guess and [PLB]." PLB refused to sign the waiver.

PLB expressed concern that MSK would use confidential information disclosed during the course of its representation of PLB. PLB noted that in a related arbitration, "[MSK] has asked a series of inflammatory questions . . . about whether there were girlfriends on the [PLB] payroll, the use of the corporate jet and inferences about the way in which PLB principals spent their money." For example, Petrocelli asked about a trip Benasra took on the corporate jet to Russia. MSK had represented Benasra in applying for a visa to visit Russia. Witnesses were also asked about Benasra's purchase of expensive automobiles and real estate, and placing girlfriends on PLB's payroll. PLB's cause for concern was further supported by the fact that MSK had just made a demand in the underlying arbitration for documents relating to use of corporate funds to cover personal expenses because such information was "necessary for claimant to defend itself against PLB's counterclaims and defenses."

According to the motion for disqualification, PLB had requested the immediate transfer of all of PLB's files in October 1999. Files were turned over in late November, but PLB believed that MSK had withheld important documents, including copies of bills, internal billing files, and conflict checks.

In opposition to the motion to disqualify, MSK claimed to have advised PLB that it was ceasing further work on its behalf in mid-1997 due to PLB's

failure to sign the conflict waiver form, and to have ceased representing PLB a year later, in mid-1998. After that date, "MSK performed minimal work in assisting a few family members and a friend of Messrs. Benasra and Goulin in processing certain immigration forms . . . in late 1998/early 1999." MSK claimed to have been first consulted by Guess regarding the dispute with PLB on May 14, 1999. As further grounds for denying the motion, MSK argued that PLB had failed to promptly raise the issue of conflict, causing it prejudice, and that PLB had not offered any admissible evidence because there were no declarations filed in support of it.

With respect to the Jet Tech arbitration, MSK presented evidence that it took place in 1994 and involved a broker's claim for a commission on the sale of PLB's corporate jet. Concerning the *Ready* action, MSK said that it "briefly represented PLB and Benasra" and "consulted intermittently with PLB and Benasra from January through May 1997." MSK withdrew be cause of PLB's failure to sign the waiver letter, described above.

Frida Glucoft, the MSK attorney who had represented PLB in immigration matters, stated in a declaration that MSK "ceased all work on PLB matters in the fall of 1997" but admitted that she responded to inquiries from the Department of Labor concerning a PLB employee between December 1997 and July 1998, and responded to "brief follow-up inquiries" after July 1998. She further admitted that she did work for a female friend of Benasra, the son and daughter of Goulin, and Benasra's teenage daughter between January and May 5, 1999. The latter representation led to the letter of May 6, 1999, in which she stated "[o]ur firm represents Mr. Michel Benasra in connection with his petition for alien relative on behalf of his daughter Charlotte Benasra." In addition, "[a]s part of the required documentation, [MSK] submitted a Form G-28: 'Notice of Entry of Appearance as Attorney.' " Glucoft purportedly told Deborah Siegel, "[her] contact person concerning [the daughter's] application," that the daughter should have new counsel. Glucoft represented that "[w]hen an applicant changes counsel, the obligation falls on new counsel to advise the INS of the change" and that "[p]rior counsel is not required to formally withdraw or be released." Glucoft denied receiving any confidential information "pertaining to PLB's relationship with [Guess], PLB's performance under license agreements with [Guess], PLB's financial condition, . . . PLB's dealings with its customers, bankers, suppliers, or lenders" or "about personal financial issues, habits, or activities related to the principles of PLB or any other of its employees."

Petrocelli stated in a declaration that in connection with the *Ready* action, "MSK did not acquire any confidential information from PLB, Benasra, or anyone else that relates to any matter at issue in [the Guess] arbitration." He specifically stated that "[t]he contention . . . that I obtained confidential

information in the <u>Ready</u> action that I later used in examining witnesses in the [related arbitration] is completely false." Petrocelli claimed that "information regarding Mr. Benasra's relationships with women and his lavish lifestyle was known to numerous individuals and publicly reported in the press."[1] Petrocelli further denied that MSK's representation of PLB made it " 'privy to the internal operating practices of PLB' " or that MSK had "a 'long history of intimacy with the inner workings of PLB,' " as PLB had claimed.

The arbitrators denied the motion, stating in their order that "[t]here is insufficient evidence to support the disqualification of [MSK] as counsel in this proceeding." Because of the stated basis for the arbitrators' order, PLB requested leave to obtain further evidence from MSK and hold a full evidentiary hearing. The panel denied the request.

### 2. *Application for TRO and OSC Filed in Court*

PLB then sought a temporary restraining order (TRO) and order to show cause (OSC) from the superior court. In conjunction with this, PLB presented a declaration from Kathleen Grzegorek, an immigration law expert. She reviewed the Glucoft declaration and MSK billing records, and INS files, identifying a number of matters in which MSK still appeared to be counsel of record for Benasra, Goulin, their family members, and other PLB employees based on the fact that applications submitted to INS on their behalf in 1998 and 1999 required several years processing time. Since Glucoft had not said that she had submitted forms to the INS formalizing withdrawal, Grzegorek believed that the INS would still consider Glucoft to be attorney of record for Benasra and the Goulins, and would communicate directly with her if necessity required. Grzegorek expressed the opinion that Glucoft must have obtained certain confidential information from the applicants, such as tax returns and records of travel. Grzegorek stated that MSK's bills reflected time spent tracking Benasra's travels. Since many of the individuals Glucoft assisted were employees or prospective employees of PLB, she would also have needed, in Grzegorek's opinion, to obtain information about employees' salaries, job duties, and backgrounds.

In support of the motion for reconsideration, PLB also submitted declarations from Benasra and Goulin to the court. Benasra's declaration stated his belief that he was a current client of MSK based on the application to bring his daughter into the United States. His declaration further said that MSK was representing PLB in various matters in late 1998, when Guess first threatened to terminate the license agreements between the parties. He stated that MSK

---

[1] The press articles attached referred to Benasra dating a famous actress and supporting a former girlfriend in a design business.

had been given both PLB's tax returns and his personal tax returns. He described consulting with MSK about a nonlitigation matter involving the termination of the licenses for an entity called Fashion Rite in which PLB was a joint venturer and which "included consideration of various issues relating to licenses and license termination, and required analysis of the nature of the commitments made by [Guess]." With respect to the *Ready* matter, Benasra stated that he "gave [MSK] a great deal of information" during its brief representation, including "both intimate personal history and the financial and operations history of PLB, which were germane because of [Ready's] allegations," including a claim for a share of PLB profits. Benasra contended that MSK had "refused to turn over a series of memoranda it wrote during its representation of [Benasra] and PLB in the sexual harassment case, claiming they are privileged or work product."

Denys Goulin stated in his declaration that PLB's general counsel, Deborah Siegel, was "instructed and authorized during the period 1993 to 1999 to provide whatever information MSK requested." He also used MSK for immigration assistance for himself and his family and believed Glucoft was still representing them in those matters.

Guess opposed the TRO and OSC application on the ground that the court lacked jurisdiction to hear the application since the issues had already been submitted to and ruled on by the arbitration panel. Guess further argued that the application was substantively meritless based on the papers and declarations already filed in the arbitration proceeding.

The court denied the application, agreeing on the record with Guess that PLB's sole remedy was to obtain relief from the arbitrators and that it lacked the power to adjudicate the dispute.

### 3. *Motion for Reconsideration Presented to Panel*

PLB sought reconsideration of the denial of the motion to disqualify based on "[n]ewly discovered evidence not previously available to be submitted to the Panel which demonstrates that this Panel was misled by earlier statements made to the Panel by [MSK]"; the declarations of Benasra, Goulin, and Grzegorek presented to the trial court; and the parties' recent filing of a lawsuit against MSK.[2] The newly discovered evidence consisted of recently

---

[2] In January 2000, PLB filed a separate lawsuit against MSK. The claim against MSK was dismissed on collateral estoppel grounds. In 2002, this court reversed and remanded based on the Supreme Court's holding in *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815 [88 Cal.Rptr.2d 366, 982 P.2d 229] that a private arbitration award was not entitled to the same collateral estoppel impact as a decision made within the judicial system. (*Benasra v. Mitchell Silberberg & Knupp* (2002) 96 Cal.App.4th 96, 108–115 [116 Cal.Rptr.2d 644].)

produced notes written by an agent for Guess dated November 30, 1998,[3] which contained reference to PLB and the following language: "Petrocelli [to] sit with Tim[;] review matter[;] fully prepared to deal with any challenge to terminating license." This indicated that MSK had been consulted prior to May 14, 1999, concerning termination of the PLB licenses contrary to Petrocelli's representation that "[p]rior to May 14, 1999, MSK had never represented or advised [Guess] in connection with any matter adverse to PLB."

Guess opposed, claiming that the document was "meaningless" and that the matter had already been fully explored. Petrocelli submitted a supplemental declaration stating that he was unaware of the November 30, 1998 meeting and was not involved in any discussion concerning terminating PLB's licenses until May 14, 1999. He said that in his only conversation with Guess on November 30, 1998, he was asked to supply a reference to a bankruptcy lawyer. Another MSK attorney, Wayne Terry, stated in a declaration that he had been consulted by Guess employees between November 30, 1998, and December 1998, and gave them "general bankruptcy advice."

The arbitrators denied the renewed motion to disqualify, again based on "insufficient evidence to support the disqualification of [MSK]."

*Arbitrators' Award*

The arbitration went forward and the panel awarded Guess $5,563,861 in damages, plus $901,968 in interest, and $1,193,848 in fees and costs for a total award of $7,659,677. The panel found that in 1997, PLB fell behind on its royalty payments, in part because of the need for cash to expand the home furnishings business. It obtained a multimillion-dollar loan with Guess's assistance, but by 1998 fell behind on both royalties and loan payments. The lender required PLB to hire a turnaround expert to take over the business. Business improved somewhat, but not sufficient for PLB to keep up to date on royalty payments. In November 1998, Guess notified PLB of its intent to terminate the agreements for nonpayment of royalties. The parties thereafter discussed a possible buy-out of PLB by Guess and signed a nonbinding letter of intent, but did not reach a final agreement. During the negotiations, Guess learned that PLB had sold in-season, first-quality merchandise to off-price retailers. Guess confronted PLB with this knowledge, and demanded that such sales cease. PLB complied. Nevertheless, on May 14, 1999, Guess notified PLB that the agreements were terminated.

The panel concluded that Guess had given notice and opportunity to cure, which expired on January 25, 1999. Thereafter, "[t]he parties continued to

---

[3] The notes actually show the date as "11/30" but there is no dispute that they were written in 1998.

negotiate a buy out and the license was de facto continued in effect until May 14, 1999, but PLB lost the right to cure . . . ." It ruled that the fact that Guess had allowed late royalty payments in the past did not result in waiver.

The panel considered the applicability of the Franchise Relations Act (Bus. & Prof. Code, § 20000 et seq.). It concluded that section 20021 permits termination without right to cure where a prior noncompliance with the agreement had occurred and had been cured. Concerning the Franchise Investment Law (Corp. Code, § 31000 et seq.), the panel stated: "Assuming *arguendo* that the FIL does apply to this relationship, any obligation to register the franchise (Corp. Code, § 31110) (and damages flowing therefrom) are barred by the applicable four-year statute of limitations (Corp. Code, § 31303)" and that the letters of intent were not "material modifications to that putative relationship."

One of the panel members dissented on the franchise question, concluding that the agreements met the definition of franchises under the FIL. He further concluded, however, that "there was no adequate proof of substantive damages flowing from the violations [of the FIL]."

### Petitions to Vacate/Confirm

Guess petitioned to confirm the arbitration award, and PLB petitioned to vacate it. PLB presented declarations from Benasra in opposition to the petition to confirm the award and in support of the petition to vacate. With respect to disqualification, Benasra continued to stress MSK's representation of PLB in the Jet Tech, Ready, Fashion Rite, and immigration matters.[4]

Petrocelli outlined in a new declaration the various proceedings in which conflict of interest was raised, insisting that the arbitrators had held a full evidentiary hearing that finally resolved the matter. With respect to the substance of the breach of duty of loyalty/conflict of interest claim, Guess asked the court to take judicial notice of the declarations and evidence previously submitted in the proceedings before the arbitration panel and in connection with the application for TRO and OSC before the trial court.

The petition to vacate was denied, and the arbitration award confirmed. At the hearing, the court stated that the alleged conflict, even if true, would not fit within the "procured, by undue means" rubric of Code of Civil Procedure section 1286.2, subdivision (a). The court further stated that PLB was

---

[4] Benasra's declaration also discussed facts related to PLB's claim that the license agreements were disguised franchises. The franchise issue and the facts related to it are discussed in part IV below.

required to establish that it did not know about the issue or raise it before the arbitrators. Appeal was noticed as to both orders and consolidated.

## DISCUSSION

### I

#### *Conflict of Interest*

Appellant claims that MSK violated well established ethical strictures against conflicts of interest and breach of duty of loyalty set forth in the Rules of Professional Conduct. In particular, rule 3-310(E) provides: "A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment." In addition, rule 3-310(C)(3) provides: "A member shall not, without the informed written consent of each client: [¶] . . . [¶] (3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter."

Rules of Professional Conduct, rule 3-310(C)(3) represents a "per se rule of disqualification which generally prevents an attorney from undertaking a representation which is adverse to a current client. [Citation.]" (*Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft* (1999) 69 Cal.App.4th 223, 230 [81 Cal.Rptr.2d 425].) Rule 3-310(E) "governs successive representation of clients with adverse interests. An attorney is forbidden from undertaking a representation adverse to a former client if there is a 'substantial relationship' between the current and former matters. [Citation.]" (*Ibid.*)

"The primary value at stake in cases of simultaneous or dual representation is the attorney's duty—and the client's legitimate expectations—of *loyalty*, rather than confidentiality." (*Flatt v. Superior Court* (1994) 9 Cal.4th 275, 284 [36 Cal.Rptr.2d 537, 885 P.2d 950].) Accordingly, "[e]ven though the simultaneous representations may have *nothing* in common, and there is *no* risk that confidences to which counsel is a party in the one case have any relation to the other matter, disqualification may nevertheless be *required.*" (*Ibid.*)

Moreover, "[a] lawyer may not avoid the automatic disqualification rule applicable to concurrent representation of conflicting interests by unilaterally converting a present client into a former client. (*American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton* (2002) 96 Cal.App.4th 1017, 1037 [117 Cal.Rptr.2d 685].) In *American Airlines*, where an attorney terminated

an existing client in order to undertake a relationship with an entity that was pursuing the client's documents, this court held that a unilateral conversion designed to avoid a concurrent representation of adverse interests "may itself be a breach of loyalty" and that the attorney and his firm "exhibited an absence of loyalty when they jettisoned [an existing client] in order to assume a preferred position with [another entity]." (*Id.* at pp. 1037, 1044.)

With respect to the successive representation of clients with potentially adverse interests, "the courts have recognized that the chief fiduciary value jeopardized is that of client *confidentiality*. Thus, where a former client seeks to have a previous attorney disqualified from serving as counsel to a successive client in litigation adverse to the interests of the first client, the governing test requires that the client demonstrate a '*substantial relationship*' between the subjects of the antecedent and current representations." (*Flatt v. Superior Court, supra,* 9 Cal.4th at p. 283.) "Where the requisite substantial relationship between the subjects of the prior and the current representations can be demonstrated, access to confidential information by the attorney in the course of the first representation (relevant, by definition, to the second representation) is *presumed* and disqualification of the attorney's representation of the second client is mandatory . . . ." (*Ibid.*)

A "substantial relationship" between the former representation and the current representation is said to exist " ' "when it appears by virtue of the nature of the former representation or the relationship of the attorney to his former client confidential information material to the current dispute would normally have been imparted to the attorney . . . ." ' " (*H. F. Ahmanson & Co. v. Salomon Brothers, Inc.* (1991) 229 Cal.App.3d 1445, 1454 [280 Cal.Rptr. 614].) In other words, "the courts focus less on the meaning of the words 'substantial' and 'relationship' and look instead at the practical consequences of the attorney's representation of the former client. The courts ask whether confidential information material to the current dispute would normally have been imparted to the attorney by virtue of the nature of the former representation." (*Ibid.*) The court should " 'focus on the similarities between the two factual situations, the legal questions posed, and the nature and extent of the attorney's involvement with the cases. As part of its review, the court should examine the time spent by the attorney on the earlier cases, the type of work performed, and the attorney's possible exposure to formulation of policy or strategy.' " (*Id.* at p. 1455, quoting *Silver Chrysler Plymouth, Inc. v. Chrysler Mot. Corp.* (2d Cir. 1975) 518 F.2d 751, 760.)

In *Jessen v. Hartford Casualty Ins. Co.* (2003) 111 Cal.App.4th 698 [3 Cal.Rptr.3d 877], the court expressed the following concern: "[L]imiting the comparison of the two representations to their precise legal and factual issues might operate unrealistically to the detriment of the first client. Depending

upon the nature of the attorney's relationship with the former client, in the office or in the courtroom, the attorney may acquire confidential information about the client or the client's affairs which may not be directly related to the transaction or lawsuit at hand but which the attorney comes to know in providing the presentation to the former client with respect to the previous lawsuit or transaction. For example, whether a lawsuit is settled or contested may depend upon a myriad of considerations about the client's affairs which might not be subject to discovery but which nonetheless determine the client's course of action . . . ." (*Id.* at p. 712) The court accordingly advocated looking at more than legal issues when comparing the prior and the current representation: "We consider the 'subject' of a representation as including information material to the evaluation, prosecution, settlement or accomplishment of the litigation or transaction given its specific legal and factual issues. Thus, successive representations will be 'substantially related' when the evidence before the trial court supports a rational conclusion that information material to the evaluation, prosecution, settlement or accomplishment of the former representation given its factual and legal issues is also material to the evaluation, prosecution, settlement or accomplishment of the current representation given its factual and legal issues." (*Ibid.*)

The allegation has been made that much of the representation at issue involved immigration matters, and that with respect to those matters the client was not PLB but various employees and officers of PLB and their families. In *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft, supra,* 69 Cal.App.4th 223, the court made clear that there are situations where confidential information obtained through the representation of a third party could lead to attorney disqualification. In *Morrison,* the law firm sought to represent a water district in a construction claim against Morrison Knudson Corp. (Morrison). The firm had an ongoing relationship with Morrison's insurance underwriters and had been retained in the past to monitor the defense attorneys Morrison retained to litigate errors and omissions claims. In that capacity, it had received confidential communications from Morrison's defense counsel concerning the progress of cases and Morrison's potential liability. The evidence indicated that the firm was " 'privy to all of the work product of assigned defense counsel' "; " 'requests and obtains reports from defense counsel which outline the claims asserted against [Morrison], the defenses available to [Morrison], an evaluation of the evidence obtained through discovery that might satisfy the claims and the defenses, litigation plans and a settlement evaluation' "; was privy to " 'the identity of all the key decision makers in the Company, the litigation philosophy of Morrison, the legal and organizational structure of [Morrison, its divisions and subsidiaries], and the financial impact on pending and existing claims against [Morrison, its divisions and subsidiaries].' " (*Id.* at p. 236.) Although the firm had never directly represented Morrison, the court concluded the situation

was "analogous to one of successive representation" and the "proper standard for assessing whether the information [the firm] received as the underwriters' counsel disqualified it from representing the [water district] is . . . the 'substantial relationship' test ordinarily applied in successive representation cases." (*Id.* at pp. 233–234.)

These authorities convince us that PLB has at least a colorable claim that MSK engaged in conflicted representation or violated its duty of loyalty by undertaking the representation of Guess in the underlying arbitration. We therefore turn to the issue of whether such conduct constitutes grounds for vacating an arbitration award.

II

*Undue Means*

A

"As the courts of this state have repeatedly emphasized, the merits of a controversy that has been submitted to arbitration are not subject to judicial review. This means that we may not review the validity of the arbitrator's reasoning, the sufficiency of the evidence supporting the award, or any errors of fact or law that may be included in the award. (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 11 [10 Cal.Rptr.2d 183, 832 P.2d 899] . . . .) Judicial review is severely limited because that result 'vindicates the intentions of the parties that the award be final, and because an arbitrator is not ordinarily constrained to decide according to the rule of law . . . .' (*Ibid.*)" (*Harris v. Sandro* (2002) 96 Cal.App.4th 1310, 1313 [117 Cal.Rptr.2d 910].) The exclusive grounds for judicial review of arbitration awards are those found in the statutes governing arbitration. (*Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at pp. 11–13; *Porter v. Golden Eagle Ins. Co.* (1996) 43 Cal.App.4th 1282, 1288 [51 Cal.Rptr.2d 338].) Otherwise, arbitration awards are immune from judicial review in proceedings to confirm or challenge the award. (*Trabuco Highlands Community Assn. v. Head* (2002) 96 Cal.App.4th 1183, 1188 [117 Cal.Rptr.2d 842].)

PLB challenges the award under section 1286.2 of the Code of Civil Procedure, which provides that a court is to vacate an arbitration award if, among other things, "[t]he award was procured by corruption, fraud or other undue means" (Code Civ. Proc., § 1286.2, subd. (a)), the alleged undue means in this case consisting of the representation of Guess by MSK. Guess argues that PLB's challenge fails for three reasons: "*First,* the Arbitrators' repeated unanimous rulings on the issue . . . are final and cannot be judicially reviewed for error. *Second,* . . . the type of conduct PLB relies on does not

constitute 'undue means' under section 1286.2(a) because it was not 'extrinsic' to the Arbitration. *Third,* as every tribunal ever to consider the issue has concluded, MSK had no conflict of interest and was not precluded from representing Guess against PLB in the arbitration."

We have already disagreed with Guess's contention with respect to finality. As we held in *Benasra v. Mitchell Silberberg & Knupp, supra,* 96 Cal.App.4th 96, due to the nature of the proceedings and the absence of an essential party, the arbitrators' ruling on the motion to disqualify is not final in the sense that it is free from collateral attack. The panel decided the issue summarily, refusing to allow PLB to subpoena records from MSK, depose MSK's attorneys, or challenge MSK's contention that certain documents pertaining to its representation of PLB and its agents and employees constituted privileged work product and did not need to be released regardless of PLB's status as a client or former client. In order to avoid the absolute bar on concurrent representation of two clients with conflicting interests, MSK claimed to have performed no legal work on the license termination for Guess until May 14, 1999. Given the ongoing nature of MSK's relationship with Guess, and the evidence that Guess had sent preliminary notice of termination to PLB and discussed getting Petrocelli involved with the license dispute months earlier, further discovery would have been warranted had this issue arisen in the context of an actual litigation. With respect to the contention that "every tribunal" has concluded MSK had no conflict of interest, the trial court in rejecting the TRO and OSC did not reach the substance of the issue, but concluded that deferral to the arbitration panel was required. The court below, in rejecting the motion to vacate, ruled that even if the conflict existed, it would not fit within the definition of "other undue means." Therefore, there has been only one tribunal to have looked at the substance of PLB's conflict of interest claim—the arbitration panel.

On the question of whether "other undue means" includes representation of the prevailing party by an attorney with a potential conflict of interest, PLB argues for a broad interpretation of the term to include any conduct that might be described as unfair. Guess takes the position that only extrinsic fraud meets the statutory requirements. We believe both parties are incorrect.

■ To determine the Legislature's intent in enacting Code of Civil Procedure section 1286.2, we begin with the words of the statute. (See *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 129 [96 Cal.Rptr.2d 485, 999 P.2d 718] ["The court's role in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law and, in doing so, the court looks first to the words of the statute"].) Subdivision (a)(1) states that the award is to be vacated if procured by "corruption, fraud or *other* undue means." (Italics added.) The principle of

*ejusdem generis* instructs that "when a statute contains a list or catalogue of items, a court should determine the meaning of each by reference to the others, giving preference to an interpretation that uniformly treats items similar in nature and scope. [Citations.]" (*Moore v. California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1011–1012 [9 Cal.Rptr.2d 358, 831 P.2d 798]; accord *Kelly v. Methodist Hospital of So. California* (2000) 22 Cal.4th 1108, 1121 [95 Cal.Rptr.2d 514, 997 P.2d 1169].) "*Ejusdem generis* applies whether specific words follow general words in a statute or vice versa. In either event, the general term or category is 'restricted to those things that are similar to those which are enumerated specifically.' " (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1160, fn. 7 [278 Cal.Rptr. 614, 805 P.2d 873].) "The canon presumes that if the Legislature intends a general word to be used in its unrestricted sense, it does not also offer as examples peculiar things or classes of things since those descriptions then would be surplusage." (*Kraus v. Trinity Management Services, Inc., supra*, 23 Cal.4th at p. 141.)

 This rule cautions against an overly broad interpretation of the term "undue means." If the Legislature intended to permit an arbitration award to be vacated whenever the prevailing party engages in tactics that might in any way seem unfair, it would not have used the specific examples of fraud and corruption to describe the type of "undue means" it had in mind.

PLB quotes the California Law Revision Commission, which stated in 1960 in connection with a review of the arbitration statutes undertaken to determine whether they should be revised: "It has been held that any conduct which amounts to fraud or which deprives either party of a fair and impartial hearing to his substantial prejudice may be ground for setting aside the award." (Recommendation Relating to Arbitration (Dec. 1960) Cal. Law Revision Com. Rep. (1960) p. G-55.) The quoted language is actually more supportive of Guess's position. The statement was based on the holding in *Stockwell v. Equitable F. & M. Ins. Co.* (1933) 134 Cal.App. 534 [25 P.2d 873], where the issue in the arbitration was the value of certain damaged property and "no notice was given to the insured or to anyone representing her by the appraisers or by the [insurer], of the time and place of making the appraisement and fixing the award." (*Id.* at p. 539.) In affirming the decision to overturn the award, the appellate court held: "[T]he award of the appraisers is void for the reason that it was illegally procured by means of implied fraud, without notice to the insured and without opportunity for her to furnish the appraisers with proof of the character or value of the real or personal property which was destroyed." (*Ibid.*) In so holding, the court stated that "[a]ny conduct which amounts to fraud or which results in depriving either of the parties of a fair and impartial hearing to their substantial prejudice may be grounds for setting the award aside." (*Id.* at p. 540.)

The rule set forth by the court in *Stockwell* and repeated by the Law Revision Commission bears a strong resemblance to the long-standing description of extrinsic fraud, a commonly used ground for vacating a final court judgment. (See, e.g., 8 Witkin, Cal. Procedure (4th ed. 1997) Attack on Judgment in Trial Court, § 223, p. 727 ["The most common ground for equitable relief [from a final judgment] is *extrinsic fraud*, a broad concept that covers a number of situations. Its essential characteristic is that it has the effect of preventing a fair adversary hearing, the aggrieved party being deliberately kept in ignorance of the action or proceeding, or in some other way fraudulently prevented from presenting his claim or defense"]; *Olivera v. Grace* (1942) 19 Cal.2d 570, 575 [122 P.2d 564] ["[T]here exists a well-recognized jurisdiction in equity which has been utilized to relieve incompetent defendants from judgments taken under circumstances of unfairness and injustice. Equity's jurisdiction to interfere with final judgments is based upon the absence of a fair, adversary trial in the original action"].)[5]

■ Despite their similar roots, however, courts have not equated the conduct necessary for setting aside a judgment with the conduct necessary for vacating an arbitration award. With regard to an attack on a judgment, the distinction between intrinsic and extrinsic fraud is of critical importance because intrinsic fraud cannot be used to overthrow a judgment, even where the party was unaware of the fraud at the time and did not have a chance to raise it at trial. (*Kachig v. Boothe* (1971) 22 Cal.App.3d 626, 633 [99 Cal.Rptr. 393], quoting *Pico v. Cohn* (1891) 91 Cal. 129, 133–134 [" 'That a former judgment or decree may be set aside, and annulled for some frauds there can be no question; but it must be a fraud extrinsic or collateral to the questions examined and determined in the action' "].) The court gave as classic examples of intrinsic fraud "the introduction of perjured testimony or false documents in a fully litigated case." (*Kachig v. Boothe, supra*, 22 Cal.App.3d at p. 634.)

---

[5] A fuller definition of extrinsic fraud was set forth more than a century ago in *United States v. Throckmorton* (1878) 98 U.S. 61, 65–66 [25 L.Ed. 93]: "Where the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practised on him by his opponent, as by keeping him away from court, a false promise of a compromise; or where the defendant never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff; or where an attorney fraudulently or without authority assumes to represent a party and connives at his defeat; or where the attorney regularly employed corruptly sells out his client's interest to the other side,—these, and similar cases which show that there has never been a real contest in the trial or hearing of the case, are reasons for which a new suit may be sustained to set aside and annul the former judgment or decree, and open the case for a new and fair hearing. [¶] In all these cases, and many others which have been examined, relief has been granted, on the ground that, by some fraud practised directly upon the party seeking relief against the judgment or decree, that party has been prevented from presenting all of his case to the court."

Explaining why introduction of perjury or false documents is considered intrinsic and cannot support a collateral attack on a final judgment where it is uncovered after the trial, the court stated: " '[W]hen [a party] has a trial, he must be prepared to meet and expose perjury then and there. He knows that a false claim or defense can be supported in no other way; that the very object of the trial is, if possible, to ascertain the truth from the conflict of the evidence, and that, necessarily, the truth or falsity of the testimony must be determined in deciding the issue. The trial is his opportunity for making the truth appear. If, unfortunately, he fails, being overborne by perjured testimony, and if he likewise fails to show the injustice that has been done him on motion for a new trial, and the judgment is affirmed on appeal, he is without remedy.' " (*Kachig v. Boothe, supra,* 22 Cal.App.3d at p. 633, quoting *Pico v. Cohn, supra,* 91 Cal. 129; see 8 Witkin, Cal. Procedure (4th ed. 1997) Attack on Judgment in Trial Court, § 242, p. 757 ["If the aggrieved party had a reasonable opportunity to appear and litigate his claim or defense, fraud occurring in the course of the proceeding is not a ground for equitable relief. The theory is that these matters will ordinarily be exposed during the trial by diligence of the party and his counsel, and that the occasional unfortunate results of undiscovered perjury or other intrinsic fraud must be endured in the interest of stability of final judgments"].)

■ Because parties to an arbitration are not afforded the full panoply of procedural rights available to civil litigants, lacking for example the right to an appeal or to extensive discovery, courts generally take a more lenient approach when examining intrinsic fraud in the context of a motion to vacate an arbitration award. In *Bonar v. Dean Witter Reynolds, Inc.* (11th Cir. 1988) 835 F.2d 1378, the charge was that the expert witness testifying on behalf of the prevailing party to support damages perjured himself in stating his credentials. Although perjury has traditionally been seen as intrinsic fraud, the court held that that the arbitration award should have been amended to delete the damages supported by the expert's testimony. The court noted that "[b]ecause the rules of the American Arbitration Association do not provide for a pre-hearing exchange of witness lists, [the moving party] Dean Witter did not know who would testify as appellees' expert witnesses until the time of the hearing. Without a pre-hearing opportunity to thoroughly investigate [the expert's] credentials, Dean Witter could not have known the extent to which he lied about them at the hearing." (*Id.* at p. 1384; accord, *Intern. Broth. Teamsters, Local 519 v. U.P.S.* (6th Cir. 2003) 335 F.3d 497 [where the main issue in an arbitration was whether a terminated union employee had physically assaulted a coemployee, and the coemployee admitted after the arbitration concluded that the terminated employee had not hit him but that he had been encouraged to say so by the employer's investigator, the circuit court remanded for the district court to vacate the award in favor of the employer if it determined there was clear and convincing evidence of fraud

and that such fraud was not reasonably discoverable prior to the conclusion of the arbitration]; see also *Newark Stereotypers' U. No. 18 v. Newark Morning Ledger Co.* (3d Cir. 1968) 397 F.2d 594, 598 ["We may assume that the obtaining of an award by perjured testimony would constitute fraud under [9 United States Code] section 10(a)"[6] ]; *Dogherra v. Safeway Stores, Inc.* (9th Cir. 1982) 679 F.2d 1293, 1297 ["Obtaining an [arbitration] award by perjured testimony constitutes fraud"].)

A type of fraud traditionally considered intrinsic was also at the center of a motion to vacate in *Lafarge Conseils Et Etudes, S.A. v. Kaiser Cement* (9th Cir. 1986) 791 F.2d 1334. The moving party charged that documents presented to the arbitrators had been falsified. The court ultimately refused to vacate the award, but not because it involved "intrinsic" fraud. The court based its decision on the fact that the party had suspected forgery during the arbitration hearing, but failed to subpoena the alleged forger or otherwise exercise due diligence to uncover it during the arbitration.

■ Rather than rely on the distinction between intrinsic and extrinsic fraud, the courts in *Bonar* and *Lafarge Conseils* set forth a three-part test to be used to determine whether an arbitration award should be vacated for fraud. "First, the movant must establish the fraud by clear and convincing evidence. [Citations.] Second, the fraud must not have been discoverable upon the exercise of due diligence prior to or during the arbitration. [Citations.] Third, the person seeking to vacate the award must demonstrate that the fraud materially related to an issue in the arbitration. [Citations.]" (*Bonar v. Dean Witter Reynolds, Inc., supra,* 835 F.2d at p 1383; accord, *Lafarge Conseils Et Etudes, S.A. v. Kaiser Cement, supra,* 791 F.2d at p. 1339.)

Guess contends that the present matter should be analyzed under the three-part test, and that PLB cannot prevail because it knew about the allegedly improper conduct (the conflict of interest or breach of duty of loyalty) and brought it to the attention of the arbitrators. Guess cites the Ninth Circuit opinion in *A.G. Edwards & Sons, Inc. v. McCollough* (9th Cir. 1992) 967 F.2d 1401 in support of its position.

In *A.G. Edwards,* the party seeking vacation of the award asserted that the prevailing party had engaged in both "fraud" and "undue means" within the meaning of 9 United States Code section 10(a)(1) by asserting facially meritless defenses. Apparently presuming that the meritless defenses influenced the arbitrators' decision, the district court vacated the award. The Ninth Circuit reversed. The primary basis for the circuit court's reversal was the district court's unwarranted presumption: "If the district court employed a presumption that the

---

[6] Like Code of Civil Procedure section 1286.2, 9 United States Code section 10(a)(1) permits an arbitration award procured by "corruption, fraud, or undue means" to be vacated.

meritless defenses had an impact on the arbitrator's decision, its holding is in obvious tension with the applicable case law. As the district court recognized, arbitrators are not required to state the reasons for their decisions. [Citations.] The rule that arbitrators need not state their reasons presumes the arbitrators took a permissible route to the award where one exists. [Citation.] Under the district court's rationale in this case, courts would be free to vacate an award in any case in which the winning side had raised even one meritless defense and the arbitrators had not specifically identified the reasons for their award. Panels of arbitrators wishing to avoid relitigation would be forced to state the reasons for their decisions in direct contradiction of the universally accepted rule that a statement of reasons is not required and arbitrators are presumed to have relied on permissible grounds. [Citation.] [¶] If the district court meant to hold that no reliance by the arbitrators on the meritless arguments need be demonstrated because the mere offering of the defenses itself constitutes 'undue means,' its holding conflicts with the language of § 10 and cases interpreting it. The statute allows for vacation of an award 'procured by corruption, fraud, or undue means.' 9 U.S.C. § 10(a)(1). Thus the statute requires a showing that the undue means caused the award to be given." (*A.G. Edwards & Sons, Inc. v. McCollough, supra,* 967 F.2d at p. 1403.)

The court gave a second reason for its reversal based on the conduct not falling within its understanding of the term "undue means": "Although the term has not been defined in any federal case of which we are aware, it clearly connotes behavior that is immoral if not illegal. *See* Black's Law Dictionary 1697 (Rev. 4th ed. 1968) ('Undue' means 'more than necessary; not proper; illegal,' and 'denotes something wrong, according to the standard of morals which the law enforces.' 'Undue influence' means any 'improper or wrongful constraint, machination, or urgency of persuasion whereby the will of a person is overpowered.'). Offering a meritless defense, however unfortunate, is part and parcel of the business of litigation; it carries no connotation of wrongfulness or immorality. In addition, it occurs with such frequency that, were the district court's rule to be adopted, the federal courts would be required to overturn arbitration awards regularly as procured by 'undue means.' This would be inconsistent with the extremely limited scope of judicial review of such awards." (*A.G. Edwards & Sons, Inc. v. McCollough, supra,* 967 F.2d at pp. 1403–1404.)

Finally, the court made the statements on which Guess seeks to rely. The court "s[aw] no reason not to apply [the three-part test devised to apply to fraud] to cases raising claims of 'undue means,'" and said that the party seeking to vacate the award had not satisfied it. (*A.G. Edwards & Sons, Inc. v. McCollough, supra,* 967 F.2d at p. 1404.) Specifically, "where the fraud *or undue means* is not only discoverable, but discovered and brought to the attention of the arbitrators, a disappointed party will not be given a second bite at the apple." (*Ibid.,* italics added.) In the case before it, the alleged

undue means—the assertion of facially meritless defenses—"were known to the [parties seeking to vacate] and the arbitrators from the outset of the arbitration." (*Ibid.*) Accordingly, the court saw this as a third and apparently separate ground for reversing the district court's ruling.

The Ninth Circuit was doubtlessly correct in ruling that the mere assertion of facially meritless defenses is insufficient ground to overturn an arbitration award. ■ Where meritless legal arguments are raised in an arbitration, the opposing party has a full and fair opportunity to contest them and mere legal error made by arbitration panels must be disregarded by the courts. (*Moncharsh v. Heily & Blase, supra,*3 Cal.4th 1.) It is not always true, however, that parties to an arbitration cannot be given "a second bite at the apple." Charges of undue means have included a party's intimidation of an arbitrator (*Bolhuis Lumber & Mfg. Co. v. Brower* (1930) 252 Mich. 562 [233 N.W. 415]) and bestowal of favors upon an arbitrator (*In Re Milwaukee Light, Heat & Traction Co.* (1910) 142 Wis. 424 [125 N.W. 903]). In such situations, the courts would have good reason to reexamine any findings made by the arbitrators concerning the facts charged.

More to the point, under similar circumstances, a California court held that a party, who did not receive a hearty "first bite" could not be precluded from having a "second bite." In *Pacific Crown Distributors v. Brotherhood of Teamsters* (1986) 183 Cal.App.3d 1138 [228 Cal.Rptr. 645], the prevailing party waited until its postarbitration brief to argue that language in a newly revised labor contract resolved the employment issue before the arbitrator. The other party did not believe the new contract applied to the situation, and had not mentioned it or presented evidence concerning it. In addition, the parties had reached an informal agreement prior to the arbitration that the provision did not apply. (*Id.* at p. 1142, fn. 1.) Although the prevailing party argued that the other party " 'had every opportunity to raise this issue to the arbitrator by either pointing it out during the course of the arbitration proceeding or by raising it after the briefs were submitted and prior to her decision,' " the trial court ruled that the award should be vacated under section 1286.2, subdivision (a), because: " '[the prevailing party] intentionally and fraudulently deprived [the other party] of its opportunity to present evidence in arbitration concerning the nonexistence of [the contractual provision] on the [relevant] date . . . .' " (*Id.* at pp. 1146, 1149.) Quoting one of the early versions of the three-part test for evaluating postarbitration claims of fraud, the appellate court said: " 'an arbitration hearing is not fraudulently obtained . . . when the protesting party had an opportunity to rebut his opponent's claims *at the arbitration hearing*' " and that " 'the focus . . . is upon whether the protesting party had an opportunity to discover and reveal the purported fraud *at the arbitration hearing.*' " (*Id.* at p. 1148, quoting *Biotronik, Etc. v. Medford Medical Instrument Co.* (D.N.J. 1976) 415 F.Supp. 133, 138.) Concluding that the

prevailing party's tactics had "den[ied] [the other party] a chance to challenge the introduction of a new issue at a confrontational, adversarial hearing as opposed to a challenge made through a post-hearing brief," the appellate court affirmed the decision to vacate. (*Pacific Crown Distributors, supra,* 183 Cal.App.3d at p. 1149.)

As we stated in *Benasra v. Mitchell Silberberg & Knupp, supra,* 96 Cal.App.4th 96, "[t]he arbitration involved claims and counterclaims between PLB and Guess, which were disputing product-licensing agreements[;] [t]he question of whether a conflict prevented [MSK] from representing Guess . . . in the arbitration was raised as an ancillary or collateral issue" (*id.* at p. 109) and "[a]ppellants have never had an opportunity to prosecute a full-blown claim for breach of duty of loyalty against [MSK] in any forum[;] [t]he single issue of whether the presentation of Guess in the arbitration required use of confidential information was presented in summary fashion to the panel of arbitrators." (*Id.* at p. 114.) Thus, it cannot be said that PLB had an opportunity to discover and reveal the alleged undue means *at the arbitration hearing.* For this reason, we do not believe that the holding in *A.G. Edwards* resolves the issue in this case.

B

Our conclusion that PLB did not receive a full hearing on its conflict of interest/breach of duty of loyalty contention does not, however, mean that the alleged breach is the type of "fraud, corruption, or other undue means" needed to vacate the award. In *Newark Stereotypers' U. No. 18 v. Newark Morning Ledger Co., supra,* 397 F.2d 594, the charge was made that the prevailing party in an arbitration intimidated an expert witness by threatening to cease doing business with his employer, and the other party asked the arbitration panel for "an inquiry or investigation for the general purpose of exposing the misconduct of the [first party]." (*Id.* at p. 600.) The court noted that the matter "was peripheral to the issue of fact which was before the arbitrators for decision" and that "[t]he panel had no general investigatory function." (*Ibid.*) Because the aggrieved party had the opportunity to present the testimony of other expert witnesses and the threatened expert agreed to nevertheless testify, the court could not say that the alleged misconduct had such a "substantial or pervasive" impact on the "award arrived at by the arbitrators after lengthy hearings and the presentation of substantial evidence by both sides . . . ." (*Ibid.*) As the Ninth Circuit said in *A.G. Edwards,* a court should not presume that perjured evidence or evidence procured by undue means had an impact on the arbitrators. Since "arbitrators are not required to state the reasons for their decisions"; we "presume[] the arbitrators took a permissible route to the award where one exists"; and the applicable statute provides for vacation of an award " 'procured by corruption, fraud, or undue

means' " (*A.G. Edwards & Sons, Inc. v. McCollough, supra,* 967 F.2d at p. 1403), the moving party needs to demonstrate a nexus between the award and the alleged undue means used to attain it.

This was similar to the approach taken in *Forsythe Intern., S.A. v. Gibbs Oil Co. of Texas* (5th Cir. 1990) 915 F.2d 1017. During the arbitration at issue there, one of the parties raised an allegation of discovery abuse.[7] The panel "did not precisely rule on the issue of discovery abuse, but indicated that it would consider all the evidence before it and would consider any misconduct on the party of [the other party] in its ultimate ruling." (*Id.* at p. 1019.) The party accused of abuse ultimately prevailed. The district court vacated the award, finding that " 'the actions and representations of [the prevailing party] during pre-hearing discovery and the arbitral panel's response or lack of response thereto so seriously undermined the arbitral process and award as to require the vacatur of the award.' " (*Ibid.*) Although the Ninth Circuit reversed, it was not because the fraud was "intrinsic" or because the party was seeking a "second bite at the apple." Instead, the court conducted a review of the arbitrators' decision to determine whether it was influenced by the alleged abuse. The court concluded that "where the panel hears the allegation of fraud and then rests its decision on grounds clearly independent of issues connected to the alleged fraud, the statutory basis for vacatur is absent." (*Id.* at p. 1022.) In the case before it, the arbitrators "rendered a decision that rested on the parties' intent as measured by their actions, and not on the language dispute that [the deposition testimony applied to]." (*Ibid.*) Indeed, one arbitrator "expressed impatience with protracted diversion from the merits" and termed the issue " 'peripheral.' " (*Id.* at p. 1023, fn. 7.) Therefore, "whatever justification may exist for condemning [the prevailing party's] conduct, such condemnation cannot rightly extend to the arbitral award." (*Id.* at p. 1023, fn. omitted.)

Responding to the question of whether the arbitrators' actions (or inaction) rendered the arbitration fundamentally unfair, the court stated: "As a speedy and informal alternative to litigation, arbitration resolves disputes without confinement to many of the procedural and evidentiary strictures that protect the integrity of formal trials. [Citation.] Parties to voluntary arbitration may not superimpose rigorous procedural limitations on the very process designed to avoid such limitations. [Citation.] The informal nature of arbitration proceedings effectuates the national policy favoring arbitration, and such proceedings require 'expeditious and summary hearing, with only restricted

---

[7] The accused party allegedly "misrepresented to the panel that [a telephonically deposed witness] was an employee . . . when in fact he was a former employee"; "control[led] the availability of [the witness] and . . . interfere[d] with the questioning of [the witness] during [the] deposition"; "imposed an arbitrary time limit on [the] deposition"; and "misrepresented . . . [the witness's] medical condition, which enabled [it] to terminate the telephonic interview prematurely." (*Forsythe Intern., S.A. v. Gibbs Oil Co. of Texas, supra,* 915 F.2d at p. 1021.)

inquiry into factual issues.' [Citations.] [¶] Submission of disputes to arbitration always risks an accumulation of procedural and evidentiary shortcuts that would property frustrate counsel in a formal trial. But because 'the advantages of arbitration are speed and informality, an arbitrator should be expected to act affirmatively to simplify and expedite the proceedings before him.' [Citation.] Thus, whatever indignation a reviewing court may experience in examining the record, it must resist the temptation to condemn imperfect proceedings without a sound statutory basis for doing so." (*Forsythe Intern., S.A. v. Gibbs Oil Co. of Texas, supra,* 915 F.2d at p. 1022.)

Like the moving party in *Forsythe,* PLB encourages us to condemn the panel for its limited inquiry into the conflict issue, but highlights no aspect of the arbitrators' award that might have been impacted by any confidential information allegedly obtained by MSK in the course of its representation of PLB and its officers and employees. The panel found that PLB fell behind on its royalty payments because of the need for cash to expand the home furnishings business, not because of any personal use of corporate funds that may have occurred. It awarded Guess royalty payments because such payment were due under the terms of the parties' agreements and it could find no basis for excusing PLB's performance. Any attempt to prejudice the panel against PLB by focusing on alleged misuse of corporate funds did not make its way into the final ruling.

PLB cites *Tsakos Shipping & Trading, S.A. v. Juniper Garden Town Homes, Ltd.* (1993) 12 Cal.App.4th 74 [15 Cal.Rptr.2d 585], and *Hernandez v. Paicius* (2003) 109 Cal.App.4th 452 [134 Cal.Rptr.2d 756], to support the proposition that an attorney conflict or breach of duty of loyalty automatically results in a fundamentally unfair proceeding and justifies vacating an arbitration award. In *Tsakos,* the judgment vacated was obtained in the course of a dual representation of diverse interests by a single attorney. The attorney failed to assert defenses that would have benefited one of his clients, a partnership, but not the individual partner whom he also represented. The defenses that should have been raised were that the partner acted without authority to bind the partnership in taking out a substantial loan, and that the partnership had previously been dissolved by operation of law. The evidence further indicated that the individual partner had not informed the other partners of the pendency of the action and that the decision to hire a single attorney to jointly represent both him and the partnership was his alone.

In *Hernandez v. Paicius, supra,* 109 Cal.App.4th 452, plaintiff learned in the midst of trial that his medical expert witness was being represented by defendant's law firm. Defense counsel proposed to cross-examine the expert with respect to his history of malpractice claims, and the court agreed to allow it as long as counsel did not inquire into any matters in which her law

firm represented him. Counsel cross-examined the expert witness vigorously concerning malpractice claims and an accusation pending before the Attorney General. The trial court denied a motion to disqualify counsel and grant a mistrial even though her firm was representing the expert in the Attorney General proceedings, on the ground that the disciplinary proceedings were public records. In closing argument, defense counsel accused the expert of being a liar, and reminded the jury that his license had been suspended, he had been sued for botching a surgery, and the Attorney General had undertaken an investigation of his acts.

On appeal, the court held that the trial court committed reversible error in denying plaintiff's motion to disqualify and to declare a mistrial. The court stated that "[d]efense counsel's representation of [defendant] required her to create a record impeaching her other client's professional reputation and credibility"; that "counsel demonstrated a dulled sensitivity to professional ethics and engaged in an egregious and shocking breach of her duty of loyalty to [the expert]"; and that "[t]he court should have intervened." (*Hernandez v. Paicius, supra,* 109 Cal.App.4th at p. 466.) The court expressed concern that "[t]he spectacle of an attorney skewering her own client on the witness stand in the interest of defending another client demeans the integrity of the legal profession and undermines confidence it the attorney-client relationship." (*Id.* at p. 467.) Although "[a] party's right to select counsel of his or her own choosing may trump the opposing party's freedom to choose an expert whose designation creates a conflict," the court further said, "if the conflict has not been resolved by the time the client/witness is called to the stand, the court is faced with an insuperable obstacle to going forward—an attorney with two clients in circumstances where he or she can be loyal only to one." (*Id.* at pp. 467–468.) Because "[t]he court cannot permit, much less preside over, an attorney's attack on his or her own client," if that situation arises "in the interests of the integrity of the bench and bar, it must declare a mistrial." (*Id.* at p. 468.)

The facts before us are distinguishable from those in *Tsakos* or *Hernandez.* In *Tsakos,* the judgment was achieved through nondisclosure of the pendency of the proceedings to effected parties and the hiring of a conflicted attorney to represent their interests. In *Hernandez,* the conflicted defense attorney had knowledge obtained through the course of her firm's representation of plaintiff's expert witness that severely undermined his credentials and credibility. Here, by contrast, PLB was represented by independent counsel in the arbitration. Its claim was that confidential information had been imparted during the course of prior or other representation and brought out in the proceeding, but it points to no particular impact MSK's continued representation of Guess had on a material issue or the arbitrator's ultimate award. In overturning the judgment, the court in *Hernandez* found it "unnecessary to decide whether plaintiff suffered actual prejudice from counsel's misconduct."

(*Hernandez v. Paicius, supra,* 109 Cal.App.4th at p. 468, fn. 10.) A court reviewing an arbitration award does not have that luxury. Judicial review of arbitrators' decisions is much more limited than appellate review of trial court decisions. (*Moncharsh v. Heily & Blase, supra,* 3 Cal.4th 1.) The statute specifically states that the award must be "*procured by* corruption, fraud or other undue means." (Code Civ. Proc., § 1286.2, subd. (a); italics added.)

We believe the present situation is more analogous to that in *In re Sophia B.* (1988) 203 Cal.App.3d 1436 [250 Cal.Rptr. 802]. In that case, the sole issue raised on appeal was whether the trial court erred in failing to disqualify conflicted counsel. The appellate court refused to overturn the judgment because "[i]t is a fundamental principle of appellate jurisprudence in this state that a judgment will not be reversed unless it can be shown that a trial court error in the case affected the result." (*Id.* at p. 1439.) Attorney disqualification "[is] often based on the *potential* that continued involvement by the attorney will cause harm to a client or former client." (*Ibid.*) Therefore, even though it may appear to the court on appeal that the disqualification motion should have been granted, "on appeal from a final judgment, an issue of attorney disqualification may not be raised unless it is accompanied by a showing that the erroneous granting or denying of a motion to disqualify *affected the outcome of the proceeding to the prejudice of the complaining party.*" (*Ibid.,* italics added.) Because there was no evidence that confidential information had been obtained or used, the court found no basis for overturning the judgment.

■ We are constrained by our interpretation of the governing statute and the relevant authorities to conclude that PLB failed to make the showing necessary to vacate the arbitration award. PLB failed to show by clear and convincing evidence that a conflict existed and that it had a substantial impact on the panel's decision. Accordingly, the trial court did not err in refusing to vacate the award on the ground that it was procured by undue means.

III, IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The order denying the petition to vacate the arbitration award and the order confirming the award are affirmed.

Vogel (C. S.), P. J., and Epstein, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 14, 2004. Werdegar, J., and Chin, J., were of the opinion that the petition should be granted.

---

*See footnote, *ante,* page 810.