Filed 11/24/14  P. v. Bland CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TRICKELL LEON BLAND,<br><br>    Defendant and Appellant. | B250125<br><br>(Los Angeles County<br>Super. Ct. No. BA391826) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Henry J. Hall, Judge.  Affirmed as modified.

Kevin D. Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James W. Bilderback II and Tannaz Kouhpainezhad, Deputy Attorneys General, for Plaintiff and Respondent.

*INTRODUCTION*

A jury convicted Trickell Leon Bland (appellant) of aggravated mayhem (Pen. Code, § 205, count 1)[1] and infliction of corporal injury on a cohabitant (§ 273.5, subd. (a), count 2). As to count 2, the jury found appellant personally inflicted great bodily injury under circumstances involving domestic violence. (§ 12022.7, subd. (e).) Although appellant was also charged with mayhem (§ 203, count 3), the jury did not reach a verdict as to that charge, which was later dismissed.

As to count 1, the trial court sentenced appellant to life in prison with the possibility of parole. As to counts 2 and 3, the trial court sentenced appellant to nine and eight years in prison, respectively, and stayed imposition of those sentences pursuant to section 654. The court awarded appellant 263 days of presentence custody and conduct credits.

On appeal, appellant raises five arguments: (1) the trial court prejudicially erred when it refused to give a pinpoint instruction on hallucinations; (2) the trial court prejudicially erred when it refused to give a character-evidence instruction; (3) even if the trial court's rulings as to the hallucinations and character-evidence instructions do not separately constitute reversible errors, those rulings cumulatively deprived appellant of due process and require reversal of his conviction; (4) the trial court improperly pronounced sentence on count 3; and (5) the trial court erred in calculating appellant's presentence custody and conduct credits.

The People concede the trial court erred in pronouncing sentence on count 3 and in calculating appellant's custody and conduct credits. We agree as to both issues. Therefore, we vacate the trial court's oral pronouncement of sentence on count 3 and direct the trial court to modify its June 5, 2013 order to reflect the correct amount of appellant's custody and conduct credits. We affirm the judgment in all other respects.

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

FACTUAL BACKGROUND

**Prosecution Evidence**

For several days leading up to the incident underlying appellant's arrest, Beverly Y., appellant's girlfriend and cohabitant, and Kiana, Beverly's adult daughter, noticed appellant was behaving in a strange manner. They observed him repeatedly and incoherently talking to himself, once claiming that a person was hiding in the bedroom closet. Beverly also saw him urinate in several places throughout their apartment, including in their stairwell, living room, and bedroom. Beverly and Kiana both thought appellant appeared to be hallucinating and, during one conversation with Kiana, appellant told her that "people at his work [were] drugging him."

Throughout the night and early morning before the incident, Beverly and Kiana called appellant's brother several times to ask him to check on appellant. Appellant's brother arrived at Beverly's apartment around 9:00 a.m. on the morning of the incident. Beverly asked appellant's brother to take appellant to the hospital. She then left appellant's brother with appellant and Kiana while she went to an appointment.

After Beverly returned from her appointment, Kiana went to the laundromat. Before she left, Kiana saw appellant and his brother sitting in Beverly's bedroom watching *The Planet of the Apes* while Beverly cooked in the kitchen. Kiana also had a conversation with appellant before she left for the laundromat during which appellant apparently acted normal and was unable to recall his strange behavior from the days before.[2] Appellant's brother departed at some point after Kiana went to the laundromat, leaving Beverly and appellant alone in the apartment.

While Beverly was cooking in the kitchen, appellant silently approached her from behind, grabbed her, and started biting her face. Appellant then knocked Beverly to the ground and continued biting her face while she tried to defend herself. Terrified, Beverly asked appellant why he was attacking her. He did not respond and continued biting her

---

[2]     Although Kiana testified about this conversation at trial, there is conflicting evidence as to whether she told investigating officers about the conversation.

face for 10 to 20 seconds, pulling out her false teeth and ripping pieces of flesh from her lips, lower jaw, cheeks, left eyebrow, and left ear. Appellant also bit Beverly's hands as she tried to defend herself. According to Beverly, appellant did not punch or kick her during the attack.

Appellant eventually stopped attacking Beverly and went back to the bedroom. Beverly then struggled down the apartment's stairs and called 9-1-1.

Los Angeles Police Department (LAPD) Officer Ryan Mar responded to Beverly's call. Officer Mar, along with several other LAPD officers, entered Beverly's apartment to conduct a search. Once inside, Officer Mar saw large amounts of blood and pieces of flesh scattered throughout the apartment's entryway and kitchen. The officers found appellant in Beverly's bedroom lying face down on the bed and covered in blood. Officer Mar's partner repeatedly ordered appellant to stand up. However, appellant was nonresponsive and appeared to be asleep. When appellant eventually woke up, the officers placed him in custody.

After conducting a search of the bedroom, Officer Mar found narcotics paraphernalia on the bed's headrest, including a glass tube with a burnt end containing a white residue and a clear vial containing a brown residue. The white residue in the glass tube was later identified as cocaine base, and the brown residue in the clear vial was later identified as phencyclidine, commonly known as PCP.

While escorting appellant from the apartment, Officer Mar noticed that appellant was having difficulty walking steadily and standing on his own. At that point, LAPD Officer Neal Oku, a drug recognition expert, arrived at the apartment, where he helped place appellant in a patrol car. Officer Oku noticed that appellant was in a "kind of daze" and exhibiting physical symptoms of PCP use, such as elevated body temperature and muscle rigidity. After placing appellant in the patrol car, Officer Oku attempted to conduct a field interview to obtain appellant's basic identifying information. Appellant was nonresponsive and failed to answer any of Officer Oku's questions.

Later at the police station, Officer Oku evaluated appellant for recent drug use. This evaluation generally consists of a breathalyzer test, a series of psycho-physical examinations designed to gauge the subject's coordination, a blood-pressure test, a heart-rate test, and a series of questions concerning the subject's drug use. Although appellant completed most of the tests, he was unable to perform the psycho-physical examinations because he could not stand or balance on his own without help.

During the evaluation, appellant spontaneously began talking about Beverly. First, he asked Officer Oku how Beverly was doing and whether she was still alive. He then stated: "I didn't mean to hurt her. I thought I was fixing what had already been done. I thought at the time if I did that, it would make me not under the influence. . . . [¶] I thought I was under the influence of PCP. I thought I smoked it, but I didn't. I used cocaine." Finally, he said: "Tell her family I didn't mean to do it."

Based on the evaluation and appellant's statements, Officer Oku concluded appellant was under the influence of PCP. Appellant's urine sample later tested positive for PCP, cocaine metabolite, and a class of sedatives called benzodiazepines.

Jennifer Markham, a criminalist for the LAPD, testified that PCP is a "dissociate anesthetic," which can work to prevent a person's body from reacting to pain and can cause a person to experience sensations through which the person's body feels disconnected from his or her mind. She also testified that PCP is known to cause its users to hallucinate and suffer panic attacks. According to Officer Oku, when a person is under the influence of PCP, he or she may quickly alternate between a drug-enhanced state, with alternating periods of increased anger and violence followed by subdued lethargy and calm awareness.

Following the attack, Beverly was rushed to the hospital where she received emergency treatment to stabilize her breathing. After she was stabilized, Beverly underwent emergency cosmetic surgery. According to one of her doctors, Beverly sustained severe injuries to her lips, with her entire lower lip having been removed from her jaw. She also sustained injuries to her left eyebrow, left ear, and both of her cheeks. In all, Beverly had to undergo four cosmetic surgeries to repair her injuries. At the time

5

of trial, she was still experiencing numbness on the left side of her face, and she could not control her bottom lip. Beverly testified that she will experience these difficulties for the rest of her life.

### Defense Evidence

Appellant presented no witnesses on his behalf.

## PROCEDURAL BACKGROUND

Appellant was charged with aggravated mayhem in violation of section 205 (count 1); infliction of corporal injury on a cohabitant in violation of section 273.5, subdivision (a) (count 2); and mayhem in violation of section 203 (count 3). As to count 2, the information alleged appellant personally inflicted great bodily injury upon Beverly under circumstances involving domestic violence within the meaning of section 12022.7, subdivision (e).

Before appellant's case was submitted to the jury, the trial court denied appellant's request for a pinpoint jury instruction on hallucinations. The trial court also refused to give a defense-requested character-evidence instruction. The trial court did, however, instruct the jury on voluntary intoxication and how it relates to the specific intent element of aggravated mayhem.

The jury found appellant guilty of counts 1 and 2, and it found true the special allegation under section 12022.7, subdivision (e). The jury did not reach a verdict as to count 3, and the trial court subsequently dismissed that count in the furtherance of justice.

On count 1, the trial court imposed an indeterminate life sentence with the possibility of parole. The trial court pronounced a nine-year sentence on count 2, and it pronounced an eight-year sentence on count 3. Pursuant to section 654, the trial court stayed imposition of appellant's sentences on counts 2 and 3. Although the trial court orally pronounced sentence on count 3, the court's minute orders and appellant's abstract of judgment do not reflect as much.

Appellant received 263 days of presentence custody and conduct credits, consisting of 229 days served and 34 days of good behavior.

6

*DISCUSSION*

**I.    The Trial Court Did Not Commit Reversible Error in Refusing to Give the Requested Hallucinations and Character-Evidence Instructions**

Appellant contends the trial court prejudicially erred in refusing to provide the jury with two defense-requested instructions: (1) the hallucinations instruction set forth in CALCRIM No. 627; and (2) the character-evidence instruction set forth in CALCRIM No. 350. We review appellant's claims of instructional error de novo. (*People v. Johnson* (2009) 180 Cal.App.4th 702, 707.)

**A.    The Requested Hallucinations Instruction**

Appellant first contends the trial court committed reversible error when it denied his request to provide the jury with a pinpoint instruction relating evidence suggesting that he was hallucinating around the time of the attack to the specific intent element of aggravated mayhem. Specifically, appellant argues the trial court's refusal to instruct on hallucinations deprived him of due process and his ability to present a meaningful defense at trial.

**i.    Relevant Proceedings**

At trial, appellant's counsel requested that the court provide the jury with CALCRIM No. 627's hallucination instruction.[3] In support of the request, counsel

---

[3]    On its face, CALCRIM No. 627 applies to the premeditation and deliberation element of first degree murder; appellant's counsel did not provide the court with proposed revisions that would make the instruction applicable to the specific intent element of aggravated mayhem.

CALCRIM No. 627 provides: "A hallucination is a perception not based on objective reality. In other words, a person has a hallucination when that person believes that he or she is seeing or hearing [or otherwise perceiving] something that is not actually present or happening. [¶] You may consider evidence of hallucinations, if any, in deciding whether the defendant acted with deliberation and premeditation. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted with deliberation and premeditation. If the People have not met this burden, you must find the defendant not guilty of first degree murder."

7

argued the trial court was required to provide the instruction to enable the jury to determine whether appellant formed the specific intent to permanently disfigure Beverly in light of the evidence indicating that appellant was hallucinating around the time of the attack.

The trial court denied the request. While acknowledging there was "reasonable" evidence that appellant was hallucinating around the time of the attack, the court reasoned the requested instruction would be duplicative of other instructions the court intended to give the jury. The court stated that the specific intent element is covered "three separate times during the course of the jury instructions." "It's covered in a kind of general sense in [CALCRIM No.] 252. It's covered in a very specific sense in [CALCRIM No.] 800, which is the instruction that defines the crime of aggravated mayhem, and I think probably from the defense's perspective, it is stated quite explicitly in . . . [CALCRIM No.] 3426, which is the voluntary intoxication instruction where it says straight ahead that the only thing . . . that [the jury] can consider [evidence of appellant's voluntary intoxication] for is whether [appellant] had specific intent and re-instructs them that if the People haven't met the burden of proving beyond a reasonable doubt that he did, that they have to find [appellant] not guilty of [aggravated mayhem]."

### ii. The Trial Court Did Not Err in Refusing to Give the Hallucinations Instruction

The People contend the trial court properly refused to give appellant's requested hallucinations instruction for two reasons: first, the instruction applies only to a charge of premeditated murder, and it may not be modified to apply to a charge of aggravated mayhem; and second, the instruction is duplicative of other instructions the trial court provided to the jury. We disagree with the People on the first ground, but agree as to the second ground. Accordingly, we conclude that the trial court did not err in refusing to instruct on hallucinations.

The trial court could have modified CALCRIM No. 627 to apply to appellant's aggravated mayhem charge. "[A] defendant, upon proper request therefor, has a right to an instruction that directs attention to evidence from a consideration of which a

8

reasonable doubt of his guilt could be engendered." (*People v. Sears* (1970) 2 Cal.3d 180, 190.) This means that "[a] defendant is entitled to an instruction relating particular facts to any legal issue." (*Ibid.*) Such an instruction tends to pinpoint the defendant's theory of defense and direct the jury's attention toward evidence that may raise a reasonable doubt as to whether the defendant committed the charged offense. (*People v. Lucero* (1988) 44 Cal.3d 1006, 1021; see also *People v. Wharton* (1991) 53 Cal.3d 522, 570 ["A criminal defendant is entitled, on request, to [an] instruction 'pinpointing' the theory of his defense"]; *People v. Harrison* (2005) 35 Cal.4th 208, 253.) Here, appellant requested a hallucinations instruction to pinpoint his theory of defense, which was that evidence indicating that he was hallucinating at the time he attacked Beverly raised a reasonable doubt as to whether he formed the specific intent to permanently disfigure her. As modified, the hallucinations instruction would have directed the jury's attention to evidence supporting appellant's theory that he lacked the specific intent to commit aggravated mayhem. (See *Sears*, *supra*, 2 Cal.3d at p. 190; *Wharton*, *supra*, 53 Cal.3d at p. 570.)

Nevertheless, the trial court properly refused to instruct on hallucinations. That instruction would have been duplicative of other instructions given to the jury, especially the voluntary intoxication instruction set forth in CALCRIM No. 3426.[4] A trial court is

---

[4] CALCRIM No. 3426 provides in relevant part: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with the specific intent to cause a disfiguring injury as required for aggravated mayhem in violation of Penal Code section 205 as charged in Count One of the Information. [¶] A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] In connection with the charge of aggravated mayhem in violation of Penal Code section 205 as charged in Count One of the Information[,] the People have the burden of proving beyond a reasonable doubt that the defendant acted with the specific intent to cause a disfiguring injury. If the People have not met this burden, you must find the defendant not guilty of aggravated mayhem." (Italics in original.)

9

not required to give a requested instruction highlighting a defense theory if that instruction "incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence. [Citation.]" (*People v. Moon* (2005) 37 Cal.4th 1, 30; see also *People v. Clark* (2011) 52 Cal.4th 856, 975 ["The court properly may refuse a proposed instruction . . . when the point is covered in another instruction"].)

"A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body." (§ 205.) Aggravated mayhem is a specific intent crime. (*People v. Ferrell* (1990) 218 Cal.App.3d 828, 833.) Thus, to be convicted of aggravated mayhem, the defendant must have acted with the intent to maim or permanently disfigure his or her victim. (*Id*. at p. 835; see also *People v. Lee* (1990) 220 Cal.App.3d 320, 324-325.)

Appellant requested a hallucinations instruction to direct the jury's attention to evidence suggesting that he may have been hallucinating around the time he attacked Beverly, and to inform the jury that it could consider that evidence in determining whether the prosecution met its burden of proof with respect to the specific intent element of aggravated mayhem. "An instruction that does no more than affirm that the prosecution must prove a particular element of a charged offense beyond a reasonable doubt merely duplicates the standard instructions defining the charged offense and explaining the prosecution's burden to prove guilt beyond a reasonable doubt." (*People v. Bolden* (2002) 29 Cal.4th 515, 558-559.) "Accordingly, a trial court is required to give a requested instruction relating the reasonable doubt standard of proof to a particular

---

The trial court also instructed the jury on reasonable doubt (CALCRIM No. 220), the elements of aggravated mayhem (CALCRIM No. 800), and specific intent (CALCRIM Nos. 252 & 800).

10

element of the crime charged *only when* the point of the instruction would not be readily apparent to the jury from the remaining instructions." (*Id*. at p. 559, italics added.)

The point of appellant's requested instruction was adequately conveyed to the jury through CALCRIM No. 3426's voluntary intoxication instruction. By giving the voluntary intoxication instruction, the trial court instructed the jury that: (1) it was permitted to consider appellant's voluntary intoxication in determining whether appellant formed the specific intent to permanently disfigure Beverly; and (2) the prosecution carried the burden of proving beyond a reasonable doubt that appellant formed such intent.

The only evidence in the record that explains why appellant may have been hallucinating when he attacked Beverly was his use of PCP, cocaine base, and sedatives at some point prior to the attack. Further, appellant did not request an involuntary intoxication instruction, and he does not contend the trial court had a sua sponte duty to provide such an instruction. Thus, the voluntary intoxication instruction adequately conveyed the purpose underlying appellant's request for the hallucinations instruction. Put another way, because the evidence establishes that any hallucinations appellant may have suffered at the time he attacked Beverly were the result of his intoxication on PCP, cocaine base, and sedatives, the limited inference the jury was permitted to reach based on those hallucinations was adequately encompassed in CALCRIM No. 3426's instruction. (Cf. § 29.4 ["No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition"]; see also *Bolden*, *supra*, 29 Cal.4th at p. 559.)

In sum, because the trial court instructed the jury on voluntary intoxication, specific intent, the elements of aggravated mayhem in general, and reasonable doubt, the jury was properly informed on how to relate the evidence suggesting that appellant may have been hallucinating around the time of the attack to the specific intent element of aggravated mayhem. (See *Johnson*, *supra*, 180 Cal.App.4th at p. 707 ["In determining whether error has been committed in giving or not giving jury instructions, [we] assume that the jurors are intelligent persons and capable of understanding and correlating all

11

jury instructions which are given"].)  As a result, appellant's requested hallucinations instruction was properly refused as duplicative of other instructions provided to the jury. (See *Moon*, *supra*, 37 Cal.4th at p. 30; *Bolden*, *supra*, 29 Cal.4th at p. 559.)

In any event, any error committed by the trial court in refusing to give a pinpoint instruction on hallucinations was harmless.  If a trial court errs in refusing to provide a requested instruction and the error does not relieve the prosecution of its burden of proof or remove from the jury's consideration an essential element of the charged offense, that error is reviewed under the harmless error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836.  (*People v. Larsen* (2012) 205 Cal.App.4th 810, 829-830.)  Any error resulting from the trial court's refusal to instruct on hallucinations is subject to a *Watson* analysis as the trial court properly instructed the jury on the specific intent element of aggravated mayhem and the prosecution's burden of proving that element beyond a reasonable doubt; the hallucinations instruction would have served only to relate specific facts to the specific intent element of aggravated mayhem.  (See *Larsen*, *supra*, 205 Cal.App.4th at pp. 829-831.)

Under the *Watson* standard, we review the entire record to determine whether it appears reasonably probable the defendant would have obtained a more favorable outcome had the error not occurred.  (*Larsen*, *supra*, 205 Cal.App.4th at p. 831.)  "'In making that evaluation, [we] may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' [Citation.]"  (*Ibid*.)  We may also consider the evidence supporting the judgment, "the instructions as a whole, the jury's findings, and the closing arguments of counsel."  (*Ibid*., citing *People v. Cain* (1995) 10 Cal.4th 1, 35-36; see, e.g., *People v. Ervin* (2000) 22 Cal.4th 48, 91 [looking to the court's instructions and defense counsel's arguments in applying the *Watson* test].)

Here, the trial court's instructions required the jury to find beyond a reasonable doubt that appellant formed the specific intent to permanently disfigure Beverly at the time he attacked her.  The trial court's instructions further informed the jury that it could

12

consider evidence that appellant was voluntarily intoxicated when he attacked Beverly in determining whether he acted with the specific intent to permanently disfigure her. Further, the trial court did not prevent the introduction of evidence of appellant's hallucinations, nor did it instruct the jury that it was precluded from considering such evidence in determining the specific intent element of aggravated mayhem. Additionally, during closing arguments, appellant's counsel extensively argued that appellant did not form the specific intent to permanently disfigure Beverly due to his drug-induced hallucinations. (See *Ervin*, *supra*, 22 Cal.4th at p. 91.) Thus, appellant's theory that he never formed the specific intent to permanently disfigure Beverly as a result of his drug-induced hallucinations was expressly brought to the jury's attention and open to the jury's consideration. (See *Larsen*, *supra*, 205 Cal.App.4th at pp. 831-832 [under a *Watson* analysis, looking to the trial court's instructions and defense counsel's closing arguments in determining whether the jury was adequately informed that it could consider evidence of the defendant's mental disease in deciding whether the prosecution established beyond a reasonable doubt the requisite intent elements].)

Additionally, strong evidence supports the jury's finding that appellant possessed the specific intent to permanently disfigure Beverly. Evidence of a controlled attack directed to a specific area of the victim's body, as opposed to an attack randomly targeting the victim's person, along with evidence of injuries constituting mayhem is sufficient to support a specific-intent finding under aggravated mayhem. (*Ferrell*, *supra*, 218 Cal.App.3d at p. 835.)

Appellant's attack was short, controlled, and directed to a specific portion of Beverly's body. As Beverly testified, appellant's attack lasted for approximately 10 to 20 seconds. Appellant did not attack Beverly in random outbursts; rather, his actions were controlled, as he silently approached Beverly, attacked only her face, and promptly returned to the bedroom once he was done. (See *People v. Park* (2003) 112 Cal.App.4th 815, 821 ["It is particularly significant that defendant stopped his attack once he had maimed [the victim's] face: he had accomplished his objective"].) Further, appellant used only his teeth to attack Beverly; he did not punch or kick her. (See *People v.*

*Campbell* (1987) 193 Cal.App.3d 1653, 1668-1669 [evidence that the defendant used only a brick and limited his attack to the victim's face supported the inference that the defendant intended to disfigure the victim's face].) Moreover, appellant's attack was directed to a specific portion of Beverly's body, as he attacked her face primarily, only biting her hands when she used them to protect her face. (See *ibid; Park, supra*, 112 Cal.App.4th at p. 821.)

In light of the foregoing, it is not reasonably probable the jury would have reached a different verdict had the trial court provided a pinpoint instruction on hallucinations. (See *Watson, supra*, 46 Cal.2d at p. 836; see also *Larsen, supra*, 205 Cal.App.4th at p. 833.)

### B.      The Requested Character-Evidence Instruction

Appellant next contends the trial court prejudicially erred when it refused to provide the jury with CALCRIM No. 350's character-evidence instruction. Appellant argues the trial court's refusal to give the instruction precluded him from presenting his defense that evidence of his character for being a nice person created a reasonable doubt as to whether he formed the specific intent to permanently disfigure Beverly.

#### i.      *Relevant Proceedings*

At trial, Beverly testified on cross-examination that appellant had always been kind to her, and that she thought he was usually a "nice guy." After the prosecution's witnesses testified, the trial court indicated that it was uncertain whether it would provide the jury with CALCRIM No. 350's character-evidence instruction. Appellant's counsel then requested the instruction, but the prosecutor objected. The prosecutor contended the instruction was inappropriate based on the state of the evidence, arguing Beverly's testimony that appellant was generally a "nice guy" did not reflect on a relevant character trait so as to warrant giving CALCRIM No. 350. The trial court agreed, stating: "On the present state of the record, I'm not going to give [CALCRIM No.] 350." During its reading of instructions, the trial court did not provide the jury with CALCRIM No. 350. The trial court did, however, instruct the jury on reasonable doubt and circumstantial evidence.

14

### ii. The Trial Court Did Not Err in Refusing to Give the Character Evidence Instruction

CALCRIM No. 350 instructs a jury that evidence of a defendant's particular character trait may, by itself, create a reasonable doubt as to the defendant's guilt.[5]  Upon request, a defendant is entitled to an instruction informing the jury that opinion or reputation evidence of one of the defendant's good character traits offered to prove the defendant acted in conformity with that trait should be weighed as any other fact established, and that such evidence may be sufficient to create a reasonable doubt as to his guilt.  (*People v. Bell* (1875) 49 Cal. 485, 490; Evid. Code, § 1102, subd. (a); see also *People v. Jones* (1954) 42 Cal.2d 219, 224 ["Proof of the good character of the defendant may be considered as a fact tending to rebut the truth of testimony of an incriminatory character which is sufficient to establish the truth of the charge against him."].)  However, the trial court has no duty to instruct on an aspect of the defense that is not supported by substantial evidence. (*People v. Bohana* (2000) 84 Cal.App.4th 360, 370.)  "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive.  [Citation.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 645.)

---

[5]  CALCRIM No. 350 provides:  "You have heard character testimony that the defendant (is a *<insert character trait relevant to crime[s] committed>* person/ [or] has a good reputation for *<insert character trait relevant to crime[s] committed>* in the community where (he/she) lives or works).  [¶]  Evidence of the defendant's character for *<insert character trait relevant to crime[s] committed>* can by itself create a reasonable doubt [whether the defendant committed *<insert name[s] of alleged offenses[s] and count[s], e.g., battery, as charged in Count 1>*]. However, evidence of the defendant's good character may be countered by evidence of (his/her) bad character for the same trait.  You must decide the meaning and importance of the character evidence.  [¶]  [If the defendant's character for certain traits has not been discussed among those who know (him/her), you may assume that (his/her) character for those traits is good.]  [¶]  You may take that testimony into consideration along with all the other evidence in deciding whether the People have proved that the defendant is guilty beyond a reasonable doubt."

15

The trial court did not err in refusing to instruct the jury with CALCRIM No. 350. The only evidence of appellant's character for being a non-violent person introduced at trial was Beverly's statement that, in her opinion, appellant was a "nice guy." No other opinion or reputation evidence of appellant's character was introduced. Beverly's single statement was not sufficient to require the trial court to instruct the jury with CALCRIM No. 350. (See *Bohana*, *supra*, 84 Cal.App.4th at p. 370; *Lewis*, *supra*, 25 Cal.4th at p. 645.)

Even if the trial court's refusal to instruct with CALCRIM No. 350 was error, such error was harmless. Here, the trial court's refusal to instruct on character evidence did not result in a misstatement of the specific intent element of aggravated mayhem or alter the burden of proof the prosecution carries in establishing that element. Accordingly, any error stemming from the trial court's refusal to instruct on character evidence is subject to a *Watson* harmless-error analysis. (See *Larsen*, *supra*, 205 Cal.App.4th at pp. 829-830.)

As noted above, the trial court properly instructed on the prosecution's burden of proving beyond a reasonable doubt every element of the aggravated mayhem charge. The trial court also specifically instructed on the element of specific intent and clarified that the prosecution carries the burden of proving that element beyond a reasonable doubt. Further, the jury's attention was directed to evidence of appellant's character for being a "nice" person as it related to the specific intent element of aggravated mayhem. During closing arguments, both the prosecutor and appellant's counsel argued as to how the jury should consider Beverly's testimony that she thought appellant was a nice person in determining whether appellant formed the specific intent to permanently disfigure Beverly. (See *Larsen*, *supra*, 205 Cal.App.4th at pp. 831-832 [under a *Watson* analysis, a reviewing court may look to the trial court's instructions and counsels' arguments in determining whether the jury was adequately informed that it could consider certain evidence in deciding whether the prosecution proved beyond a reasonable doubt the elements of the charged offenses].)

16

Additionally, strong evidence supports the jury's finding that appellant possessed the specific intent to permanently disfigure Beverly. As discussed in greater detail above, the evidence established that appellant's attack was short, performed in a controlled manner, and directed toward a specific portion of Beverly's body. (*Ferrell*, *supra*, 218 Cal.App.3d at p. 835; See *Park*, *supra*, 112 Cal.App.4th at p. 821.) Further, there was no dispute that appellant was under the influence of PCP at the time he attacked Beverly, a drug that, as Officer Oku testified, can increase an individual's tendency toward violence. In contrast, there was minimal evidence that appellant did not form the specific intent to commit aggravated mayhem based on his character for being a nice person: Beverly stated once that she thought appellant was usually a nice person. (*People v. Breverman* (1998) 19 Cal.4th 142, 177.) Nevertheless, the jury was free to consider that evidence in determining whether the prosecution satisfied its burden of proving every element of aggravated mayhem beyond a reasonable doubt. In light of the instructions provided to the jury, the strong evidence supporting the jury's finding that appellant formed the specific intent to commit aggravated mayhem, and the minimal evidence of appellant's character for being a nice person, it is not reasonably probable that the jury would have reached a different verdict had the trial court instructed on character evidence. (See *Watson*, *supra*, 46 Cal.2d at p. 836; see also *Larsen*, *supra*, 205 Cal.App.4th at p. 833.)

Next, we reject appellant's argument that the trial court's refusal to instruct with CALCRIM No. 350 deprived him of his federal due process rights in such a manner as to warrant automatic reversal of his aggravated mayhem conviction. It is well settled that the United States Constitution does not require a trial court to instruct on circumstantial evidence when the jury is properly instructed on reasonable doubt. (*People v. Rogers* (2006) 39 Cal.4th 826, 886, citing *Holland v. United States* (1954) 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150; see also *People v. Stoll* (1989) 49 Cal.3d 1136, 1161 [characterizing character evidence bearing on the issue of whether the defendant committed the charged crimes as "circumstantial evidence"].) Here, the trial court instructed the jury on reasonable doubt. Appellant does not challenge the propriety of that instruction, and we find no error in the way it was given to the jury. (See *Rogers*,

17

*supra*, 39 Cal.4th at pp. 886-887 [noting the United States Supreme Court's approval of California's reasonable doubt instruction in *Victor v. Nebraska* (1994) 511 U.S. 1, 7-17, 114 S.Ct. 1239, 127 L.Ed. 2d 583].)

Finally, appellant contends he was prejudiced by the cumulative effect of the trial court's refusal to instruct on hallucinations and character evidence. We disagree. As we have already discussed, the trial court did not err in refusing to provide either instruction. Thus, there was no error to cumulate.

## II. The Trial Court Erred in Orally Pronouncing Sentence on Count 3

The People concede that the trial court erred in pronouncing sentence on count 3. We agree and vacate the trial court's pronouncement of sentence on that count.

The jury returned guilty verdicts as to counts 1 and 2, and it returned a true finding as to the enhancement allegation under count 2; the jury did not, however, return any verdict as to count 3. Likewise, the jury's verdict forms for count 3 were returned blank. The trial court's May 8, 2013 minute order reflects that count 3 was dismissed in the furtherance of justice pursuant to section 1385. However, the trial court later pronounced, but suspended imposition of, an eight-year sentence as to count 3. Because the jury did not reach a verdict as to count 3, the trial court erred when it pronounced sentence on that count. (See *People v. Traugott* (2010) 184 Cal.App.4th 492, 500 [a defendant cannot be convicted of a felony unless a full jury deliberates and reaches a unanimous guilty verdict]; see also *People v. Scott* (1994) 9 Cal.4th 331, 354 ["a sentence is generally 'unauthorized' where it could not lawfully be imposed under any circumstance in the particular case"].)

Here, the reporter's transcript reflects that the trial court incorrectly pronounced sentence on the dismissed count 3. However, the trial court's June 5, 2013 minute order reflects that appellant was not sentenced on count 3. "In a criminal case, it is the *oral pronouncement of sentence* that constitutes the judgment." (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1324, italics in original.) Therefore, we vacate the trial court's incorrect oral pronouncement of sentence on count 3.

**III.** **The Trial Court Erred in Calculating Appellant's Presentence Custody and Conduct Credits**

The People also concede that the trial court erred in calculating appellant's presentence custody and conduct credits. We therefore direct the trial court to modify its June 5, 2013 order and correct appellant's abstract of judgment to reflect the proper amount of credits appellant is entitled to.

At the sentencing hearing, the trial court awarded appellant a total of 263 days of credits, consisting of 229 actual days for presentence custody plus 34 days for good conduct. This was error. Appellant was first taken into custody on December 13, 2011, where he remained for 201 days until he was released on bail on June 30, 2012. He was later remanded on May 8, 2013, where he remained in custody for 29 more days until sentencing on June 5, 2013. Therefore, at the time of sentencing, appellant had accrued 230 days of presentence custody credits.

Under section 2933.1, appellant accrued conduct credits at the rate of 15 percent of the 230 days he served in presentence custody, which totals 34 days. (See *People v. Ramos* (1996) 50 Cal.App.4th 810 [trial court may not round conduct credits up to a number that would fall between 15 and 16 percent of the number of days served in presentence custody].) Thus, appellant was entitled to 264 days of presentence custody and conduct credits.

*DISPOSITION*

We vacate the trial court's oral pronouncement of sentence on count 3. The trial court is directed to modify its June 5, 2013 order and correct appellant's abstract of judgment to reflect that appellant was awarded 264 days of presentence custody and conduct credits. The trial court is requested to forward corrected certified copies of

19

appellant's abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

                                                            **WOODS, J.**

**We concur:**

          **PERLUSS, P. J.**                           **SEGAL, J.**[*]

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.