Filed 2/28/24  Hardiman v. The Woodlands Store CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ROY HARDIMAN et al.,<br><br>      Plaintiffs and Appellants,<br>v.<br><br>THE WOODLANDS STORE, INC.,<br><br>      Defendant and Respondent. | A166704<br><br><br>(Marin County<br>Super. Ct. No. CIV220179) |

This appeal involves a dispute over an appraisal of plaintiffs Roy and Janet Hardiman's (Hardimans) 15-percent ownership interest in a grocery business owned and operated by defendant The Woodlands Store, Inc. (Woodlands).

The Hardimans challenge the superior court's decision to deny their petition to vacate the appraisal–arbitration award and to confirm the award in favor of Woodlands.  (Code Civ. Proc., §§ 1286.2, 1285.)[1]  They reason that the award was procured by fraud and that the arbitrator (in this case, the appraiser) substantially prejudiced their rights by committing misconduct and by refusing to postpone the arbitration hearing or hear material evidence.  Accordingly, the Hardimans seek reversal of the judgment and a

---

[1] Unless otherwise stated, all statutory citations herein are to the Code of Civil Procedure.

1

remand of this matter to the superior court with instructions to vacate the award.

We find no basis for disturbing the appraisal–arbitration award and therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Woodlands is a closely held corporation operating three grocery stores, one in San Francisco[2] and two in Marin County. From 2010 to 2021, Roy Hardiman was a member of Woodlands's board of directors. He and his wife, Janet Hardiman, also collectively owned a 15-percent share of Woodlands's outstanding stock.

### I.    *Amended and Restated Shareholders Agreement.*

In 2012, the Hardimans signed the operative amended and restated shareholders agreement with Woodlands, which gave them a contractual right to have Woodlands repurchase their shares at a price to be determined "by an appraiser of recognized standing" jointly selected by the parties.

In late 2020 and early 2021, Woodlands made several business decisions with which the Hardimans disagreed. One such disagreement, set out in a letter the Hardimans sent to Woodlands's counsel on May 10, 2021, related to the recent decision by the company to purchase five condominium units in San Francisco. According to this letter, Hardiman did not learn of the purchase until after it occurred because the company, in violation of its own rules, scheduled a special board of directors meeting to review and approve the purchase with just one business day's notice.

On May 20, 2021, Woodlands's counsel responded to the Hardimans' letter. Counsel explained that Woodlands purchased the five condominium units in which the company operated its San Francisco store, which the

---

[2] The San Francisco store sold both groceries and pet supplies.

company previously rented, for "the discounted price of $5,475,000 . . . ." Counsel also advised the Hardimans that the five condominium units "were recently appraised for approximately $1.5 million more than the discounted price that [Woodlands] paid."

A few months later, on July 27, 2021, the Hardimans exercised their so-called "Exit Right" under the amended and restated shareholders agreement to compel Woodlands to repurchase their 15-percent ownership interest. The parties thus began the process of jointly selecting an arbitrator to determine the stock's fair market value, ultimately choosing Serena Morones of Morones Analytics (appraiser).

## II.    *Appraisal Process.*

On November 16, 2021, the parties signed an engagement letter with the appraiser that laid out the ground rules for the appraisal process. In adherence with these rules, the following measures were taken: (1) the appraiser issued an initial list of document requests to the parties covering 23 categories of information, leaving open the possibility of additional requests; (2) after the appraiser obtained "sufficient information within an adequate timeframe necessary to reach an independent conclusion," she met ex parte with each side and their counsel to discuss the company and its valuation; and (3) each side then submitted a written memorandum "summariz[ing] the nature of the company and any unique valuation issues that you want us to consider" that was accompanied by "all documents and data that you wish for us to consider as part of the appraisal." During this process, neither side disclosed to the appraiser the existence of the May 20, 2021 letter from Woodlands's counsel to the Hardimans relating to Woodlands's purchase of the five San Francisco condominium units in which the San Francisco store was operated.

3

## A.    The Appraiser's Draft Report.

On February 10, 2022, after the appraisal process was complete, the appraiser issued a draft report.  Pursuant to the terms of the engagement letter, the parties were permitted to comment on the draft report, but only for the purpose of addressing typographical or factual errors and not "any issues of valuation methodology . . . ."

On February 22, 2022, the Hardimans submitted a nine-page letter identifying several concerns they had regarding the draft report.  Relevant here, their letter noted that the draft report concluded the recently purchased San Francisco condominium units were "a 'non-operating'" valued at $5,425,000.  Taking issue with this value, the letter continued:  "The [draft report] recognizes that the condominiums ought to be appraised according to their 'market value.'  [Citation.]  But, the [draft report] states:  'We are not real estate appraisers.'  [Citation.]  Rather than obtain an appraisal for the value of these condominiums, the [draft report] instead 'assumes the option purchase price as a reasonable indication of market value *based on management's representation.*  [Citation.]  The Draft Report acknowledges that this assumption is 'extraordinary.'  [Citation.] [¶] Management's 'representation' about the value of these condominiums is surprising given that as recently as May 2021 Woodlands claimed (though its lawyer, Frank Cialone) that the condominiums were purchased at a 'discounted price of $5,475,000.'  **Exhibit 1** at 1.[3]  Woodlands also claimed that these condominiums had been 'recently appraised for approximately $1.5 million

---

[3] The Hardimans' February 22, 2022 letter to the appraiser attached as exhibit A the May 20, 2021 letter from Woodlands's counsel to the Hardimans.

more than the discounted purchase price than [*sic*] the Company paid.' *Id.* at 1."

The Hardimans' February 22, 2022 letter to the appraiser then concluded: "It is disappointing that Woodlands did not furnish you with the appraisal referenced in its lawyer's prior letter. In any event, it is clearly erroneous—and it would be tantamount to the knowing acceptance of a misrepresentation—to ignore the true and available facts regarding any recent relevant appraisal(s) of the condominiums."

Later the same day, Woodlands's counsel advised the appraiser that the company would not be responding to the Hardimans' critiques of her methodologies and conclusions "as that is outside the scope of this post-draft process." Nonetheless, the appraiser asked Woodlands, in light of the new information contained in the Hardimans' letter, to provide any additional documents in its possession that "may indicate fair market value of the SF real estate . . . ."

On February 28, 2022, Woodlands's counsel wrote to the appraiser to advise her that Woodlands would not provide any additional documents since, under the terms of the engagement letter, the time for the parties' document exchange had passed. Woodlands's counsel posited that the Hardimans were violating the parties' agreed-upon rules by challenging the draft report on matters that related not to perceived factual errors but to perceived errors in the appraiser's analysis, "including your valuation of specific assets, the comparable data and multiples that you selected, and much more." Woodlands, in turn, was complying with the agreed-upon rules by refraining from challenging what it perceived as the appraiser's analytic errors, including her conclusion that the five recently purchased San Francisco condominium units were "non-operating" assets.

5

In particular, Woodlands's counsel explained that Woodlands's failure to provide the appraiser information regarding the value of these condominium units was based on its view that the units were operating assets: "Your information request, dated November 18, 2021, calls for 'Information regarding any non-operating assets held by the company, such as real estate, surplus working capital, airplanes, boats. Income and expense information related to non-operating assets.' The condominium units are operating assets. They are where the Company's San Francisco store is located and operated. Prior to buying those units the Company leased them, and the Company purchased them by exercising an option that was included in that lease. The condominium units cannot be sold without closing the San Francisco store or renting the units from the buyer, likely at significantly higher cost. They are part of the ongoing infrastructure of the Company. As an operating asset, the value of the condominiums would be captured in the overall enterprise valuation of the Company. A separate valuation would not be warranted, you did not request appraisals or valuation information regarding operating assets, and the Company did not provide it."

Woodlands's counsel also reminded the arbitrator that the Hardimans had full knowledge during the appraisal process of the documents and information Woodlands did and did not provide—including its omission of any real estate appraisal. The Hardimans, counsel noted, were also in possession of his May 20, 2021 letter that referenced the appraisal of the condominium units and could have provided—but did not provide—it. At this point, however, the company's position was that it was too late for the appraiser or the Hardimans to insist on further disclosures since the final report was now due.

6

On February 28, 2022, the appraiser responded to Woodlands's counsel's letter, insisting it was "entirely reasonable" to request evidence regarding the condominium appraisal because, in her professional opinion, the "existence and amount of an appraisal of the real estate is a factual issue" that she deemed "critical to support [her] assumptions." The appraiser also warned that if Woodlands declined to provide the appraisal, "I will issue a final report, disclaiming the value of the real estate component, describing the basis for my conclusion as the acquisition cost, but noting that an appraisal exists and was not provided."

## B. The Appraiser's Final Report.

Woodlands did not provide any further information or documentation, and a few weeks later, on March 9, 2022, the appraiser issued the final report. In it, the appraiser valued the Hardimans' 15-percent ownership interest in Woodlands at $3,366,000, the same amount stated in the draft report.

As the appraiser had warned, the final report included the following statement in its list of "Extraordinary Assumptions": "After issuance of our draft report, we were informed by [the Hardimans' counsel] that a recent appraisal of the San Francisco condominiums prior to the Valuation Date existed and should be considered in our analysis. We requested the appraisal from [Woodlands's counsel] who declined to provide that information. As a result, the estimated market value of the San Francisco condominiums remains an extraordinary assumption of our analysis and if evidence does exist to support a value other than we have assumed, then our opinion of Fair Market Value of the Company may differ from our current conclusion." Nonetheless, the final report also contained the following disclaimer: "In preparing this report, we have relied upon information believed to be reliable

and accurate. We have no reason to believe that any material facts have been withheld from us, nor do we warrant that our investigation has revealed all of the matters in which an audit or more extensive examination might disclose."

## III. *Court Proceedings.*

On March 14, 2022, Woodlands tendered payment of $3,336,000 to the Hardimans pursuant to the amended and restated shareholders agreement and asked the Hardimans to send their stock certificates to the company in exchange. On March 21, 2022, the Hardimans instead filed a demand for arbitration with JAMS.

Woodlands objected to the Hardimans' arbitration demand on the grounds that, under California law, the appraisal process constituted an arbitration proceeding and the final report constituted an arbitration award subject to challenge only in court, pursuant to the California Arbitration Act (§ 1280 et seq.). After considering the parties' briefs and argument, the JAMS arbitrator accepted Woodlands's jurisdictional argument. Accordingly, on June 17, 2022, the Hardimans filed a petition to vacate the appraisal–arbitration award in Marin County Superior Court.

On October 11, 2022, after a contested hearing, the superior court denied the Hardimans' petition to vacate and confirmed the appraisal–arbitration award. Judgment[4] was thus entered in favor of Woodlands, prompting this appeal.

## DISCUSSION

The Hardimans contend the superior court erred by denying their petition to vacate the appraisal–arbitration award because: (1) the award was

---

[4] The judgment was modified, and an amended judgment was entered on October 26, 2022.

8

procured by corruption, fraud or undue means (§ 1286.2, subd. (a)(1)); (2) their rights were substantially prejudiced by the arbitrator's misconduct (§ 1286.2, subd. (a)(3)); and (3) their rights were substantially prejudiced by the arbitrator's refusal to postpone the hearing upon sufficient cause or to hear evidence material to the controversy (§ 1286.2, subd. (a)(5)).[5] We address each contention in turn after setting forth the applicable standard of review, which, as we will explain, is highly deferential to the arbitrator.

I.    *Standard of Review.*

The California Supreme Court has spoken at length on the general rule of arbitral finality, which stems from our public policy's preference for settling disputes by private arbitration rather than litigation. (E.g., *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 8–12 (*Moncharsh*); *Heimlich v. Shivji* (2019) 7 Cal.5th 350, 366 (*Heimlich*).) In brief, "it is the general rule that parties to a private arbitration impliedly agree that the arbitrator's decision will be both binding and final. Indeed, 'The very essence of the term "arbitration" [in this context] connotes a binding award.' [Citation.] . . . [¶] This expectation of finality strongly informs the parties' choice of an arbitral forum over a judicial one. . . . [¶] . . . Because the decision to arbitrate grievances evinces the parties' intent to bypass the judicial system and thus avoid potential delays at the trial and appellate levels, arbitral finality is a core component of the parties' agreement to submit to arbitration. Thus, an arbitration decision is final and conclusive *because the parties have agreed that it be so*. By ensuring that an arbitrator's decision is final and binding,

---

[5] For purposes of our legal discussion, and in light of the unchallenged lower court finding that the appraisal in the case qualifies as an arbitration award under California law, we hereafter refer to the appraiser as "arbitrator."

9

courts simply assure that the parties receive the benefit of their bargain. [Fn. omitted.]" (*Moncharsh*, at pp. 9–10.)

In light of this general rule, a "court's power to correct or vacate an erroneous arbitration award is closely circumscribed. [Citations.] . . . [¶] [Indeed,] [m]ost legal errors in arbitration are not reviewable. [Citations.] An award may be vacated only for fraud, corruption, misconduct, an undisclosed conflict, or similar 'circumstances involving serious problems with the award itself, or with the fairness of the arbitration process.' (*Moncharsh*, at p. 12; see § 1286.2, subd. (a).) Otherwise, judicial corrections are limited to remedying 'obvious and easily correctable mistake[s],' 'technical problem[s],' and actions in excess of authority so long as the correction leaves the merits of the decision unaffected. (*Moncharsh*, at p. 13; see § 1286.6.) '[B]y voluntarily submitting to arbitration, the parties have agreed to bear the risk [of uncorrectable legal or factual error] in return for a quick, inexpensive, and conclusive resolution to their dispute.' (*Moncharsh*, at p. 11.) [Fn. omitted.]" (*Heimlich, supra*, 7 Cal.5th at p. 367; accord, *id.* at p. 368 [" ' "The statutory provisions for [review of an arbitration award] are manifestly for the sole purpose of preventing the misuse of the proceeding, where corruption, fraud, misconduct, gross error, or mistake has been carried into the award to the substantial prejudice of a party to the proceeding" ' "].)

On appeal, when the relevant facts are undisputed, we review an order denying a petition to vacate an arbitration award and confirming the award de novo. (*Baker Marquart LLP v. Kantor* (2018) 22 Cal.App.5th 729, 740 (*Baker Marquart*).)

## II. *No Fraud, Corruption or Other Undue Means.*

The Hardimans first contend the appraisal–arbitration award must be vacated pursuant to section 1286.2, subdivision (a)(1) because it was procured by Woodlands through " 'corruption, fraud or other undue means.' "

For purposes of section 1286.2, subdivision (a)(1), "fraud" means "extrinsic fraud which denies a party a fair hearing . . . ." (*Comerica Bank v. Howsam* (2012) 208 Cal.App.4th 790, 825 (*Comerica Bank*).)  Similarly, while the standard for "undue means" has not been clearly articulated, "cases suggest the term refers to unfair conduct that ' " 'deprives either party of a fair and impartial hearing to his substantial prejudice.' " ' (*Maaso v. Signer* (2012) 203 Cal.App.4th 362, 371–372 [citation]; see *Baker Marquart LLP v. Kantor* (2018) 22 Cal.App.5th 729, 739–741 [citation]; *Pour Le Bebe, Inc. v. Guess? Inc.* (2003) 112 Cal.App.4th 810, 827, 833–834 [citation].)" (*Starr v. Mayhew* (2022) 83 Cal.App.5th 842, 856.)  In both contexts, " ' "[a] fundamentally fair hearing requires . . . notice, opportunity to be heard and to present relevant and material evidence *and argument* before the decision makers . . . .  [Citations.]  "The arbitrator . . . must give each of the parties to the dispute an adequate opportunity to present its evidence *and arguments*." ' " (*Baker Marquart, supra*, 22 Cal.App.5th at p. 740.)  Here, this standard for vacating an arbitration award is not met.

According to the Hardimans, Woodlands (1) affirmatively misrepresented the value of the San Francisco condominium units in their ex parte meeting with the arbitrator, (2) lied about the existence of the appraisal of these units at this meeting, and (3) continued to withhold evidence of the appraisal after the arbitrator learned about it and asked for it.  However, even accepting the argument that Woodlands engaged in this conduct, it does not prove what section 1286.2, subdivision (a)(1) requires—

11

that the Hardimans were deprived of a fair and impartial arbitration hearing to their substantial prejudice. (*Comerica Bank, supra*, 208 Cal.App.4th at p. 825; *Starr v. Mayhew, supra*, 83 Cal.App.5th at p. 856.)

On the contrary, the record reflects the Hardimans had full opportunity during the arbitration process to address the value of the five San Francisco condominium units purchased by Woodlands in 2021. It is undisputed the Hardimans had notice of this real estate purchase almost immediately after it was consummated. Woodlands's letter to the Hardimans on May 20, 2021, revealed both the condominiums' purchase price ($5,475,000) and their subsequent appraised value of $1.5 million over the purchase price. While the Hardimans claim Woodlands fraudulently concealed this information, in fact the Hardimans failed to produce it. They acknowledge having this letter and failing to give it to the arbitrator until after she issued the draft report. Under the agreed-upon terms of the engagement letter, the Hardimans were obligated to provide the arbitrator "all documents and data that you wish for us to consider" before preparation of the draft report. As such, they cannot complain about the arbitrator's failure to have this information when they could have given, but did not give, it to her in a timely manner.[6]

Moreover, while the Hardimans also claim Woodlands made fraudulent statements to the arbitrator about the condominiums' value and appraisal during their ex parte meeting with her, there is evidence to the contrary. Woodlands submitted a declaration to the superior court attesting that

_____

[6] It is also undisputed that when Woodlands submitted its own documents in response to the arbitrator's requests on December 2, 2021, Woodlands copied the Hardimans' counsel, who confirmed that he received and opened the documents. The Hardimans were thus on notice that Woodlands did not include the May 20, 2021 letter from its counsel to the Hardimans, or the appraisal referenced therein, in its documents.

during the appraisal process: (1) The company did not submit any information about the condominiums' value because the arbitrator requested valuation information only as to nonoperating assets and the company considered the condominiums to be operating assets since they were used exclusively to operate the San Francisco stores. (2) When Woodlands met ex parte with the arbitrator, she did not ask for or about any appraisals or valuation information regarding the condominiums; rather, the arbitrator merely confirmed there were no appraisals or valuation information relating to nonoperating assets. (3) Because Woodlands considered the condominiums to be operating assets, Woodlands appropriately confirmed it had no appraisals or valuation information of nonoperating assets. (4) It was not until several weeks later, when Woodlands received the draft report, that it first learned the arbitrator intended to treat these properties as nonoperating assets.

The arbitrator did not make a factual determination below as to whether Woodlands engaged in misconduct by failing to produce evidence regarding the condominiums' value prior to her issuance of the draft report. We decline to make this determination for the arbitrator on appeal. As explained *ante*, it is not the role of the appellate court to weigh evidence in conducting its limited review of an arbitration award for fraud or undue means. (*Heimlich, supra*, 7 Cal.5th at p. 368.)

Finally, the Hardimans correctly note Woodlands continued to withhold evidence relating to the condominiums' value and appraisal *after* the arbitrator learned about it and requested it. However, Woodlands also explained to the arbitrator why it was refusing to produce this evidence, asserting through counsel that per the engagement letter the time period for exchange of information had expired and the arbitrator's final report was

13

due.  (See pp. 5–6, *ante*.)  Woodlands's counsel also asserted the Hardimans were violating the arbitrator's rule that barred the parties from complaining about the draft's reasoning or analysis with respect to the condominiums' value.  Woodlands's decision not to produce this evidence was based on its view that the arbitrator incorrectly labeled the condominiums as " 'non-operating assets' "—an analytical finding not subject to challenge at that point in the arbitration process.

The arbitrator implicitly accepted at least some of Woodlands's position when she issued the final report, reaffirming her appraisal of the Hardimans' stock at a value of $3,336,000.  While the final report contained a qualification that the valuation of the San Francisco real estate was an "extraordinary assumption" given the company's refusal to produce the appraisal, it also confirmed "we have relied upon information believed to be reliable and accurate" and "have no reason to believe that any material facts have been withheld . . . ."

Under these circumstances, the Hardimans have not proved Woodlands's refusal to produce the real estate valuation or appraisal deprived them of " ' " 'a fair and impartial hearing to [their] substantial prejudice.' " ' " (*Starr v. Mayhew, supra*, 83 Cal.App.5th at p. 856.) " ' "Parties who stipulate in an agreement that controversies that may arise out of it shall be settled by arbitration, may expect not only to reap the advantages that flow from the use of that nontechnical, summary procedure, but also to find themselves bound by an award reached by paths neither marked nor traceable and not subject to judicial review." ' " (*Moncharsh, supra*, 3 Cal.4th at p. 11; see *Pour Le Bebe, Inc. v. Guess? Inc.* (2003) 112 Cal.App.4th 810, 833–834 (*Pour Le Bebe*) [since arbitrators are not required to state the reasons for their decisions, "we 'presume[] the arbitrators took a

14

permissible route to the award where one exists' "].)  Applying this principle here, we decline to disturb the appraisal–arbitration award pursuant to section 1286.2, subdivision (a)(1).

### III. *No Refusal by Arbitrator to Postpone the Hearing or to Hear Material Evidence.*

The Hardimans also contend the appraisal–arbitration award must be vacated, pursuant to section 1286.2, subdivision (a)(5), because the arbitrator improperly failed to postpone the hearing or consider the unproduced evidence relating to the condominium units' valuation before issuing the final report.

As the California Supreme Court instructs, "vacation of an award for 'refusal . . . to hear evidence material to the controversy'  (§ 1286.2, subd. (a)(5)) must rest on more than a simple error in applying the rules of evidence. . . .  [S]ection 1286.2, subdivision (a)(5), 'if not properly limited, could swallow the rule that arbitration awards are generally not reviewable on the merits.'  The provision is not 'a back door to *Moncharsh* through which parties may routinely test the validity of legal theories of arbitrators.' [Citation.]  Instead, it was designed as a 'safety valve in private arbitration that permits a court to intercede when an arbitrator has prevented a party from fairly presenting its case.'  [Citation.]  It comes into play, for example, when an arbitrator, without justification, permits only one side to present evidence on a disputed material issue. (See *Moncharsh, supra*, 3 Cal.4th at p. 13.) . . . To conduct an arbitration without abiding by that principle evinces bias, constituting misconduct." (*Heimlich, supra*, 7 Cal.5th at pp. 368–369.)

This one-sidedness did not occur here.  As explained, the arbitrator provided both sides the opportunity to submit a written memorandum supported by any factual information and legal analysis the parties deemed relevant.  The arbitrator also met individually with each side and their

15

counsel to discuss their documentation before issuing the draft report. Throughout these procedures, the Hardimans could have mentioned, but did not mention, the May 2021 letter from Woodlands's counsel referencing the condominium units' value and appraisal. The parties then had the opportunity to submit objections to the draft report that, per the engagement letter, were limited to correction of factual errors. The Hardimans took full advantage of this opportunity, submitting a nine-page letter with a list of purported errors that included the arbitrator's valuation of the San Francisco condominium units.

As previously discussed, the arbitrator took the Hardimans' objection seriously and called on Woodlands to produce further evidence relating to her valuation of the units, including any appraisal. Woodlands refused and explained why—the time for document production had passed and the company considered the condominiums to be operating assets for which no appraisal information was required. Neither Woodlands nor the Hardimans requested a hearing on the issue or postponement of the proceedings, and the arbitrator made no further demands for evidence. Instead, the arbitrator issued the final report.

On this record, there is no basis to conclude the arbitrator prevented the Hardimans from fairly presenting their case. (*Heimlich, supra*, 7 Cal.5th at pp. 368–369.) On the contrary, the Hardimans were given every opportunity to do so consistent with the terms of the parties' engagement letter. Nothing  more was required. " 'Submission of disputes to arbitration always risks an accumulation of procedural and evidentiary shortcuts that would property frustrate counsel in a formal trial. But because "the advantages of arbitration are speed and informality, an arbitrator should be expected to act affirmatively to simplify and expedite the proceedings before

16

him." [Citation.] Thus, whatever indignation a reviewing court may experience in examining the record, it must resist the temptation to condemn imperfect proceedings without a sound statutory basis for doing so.' " (*Pour Le Bebe, supra,* 112 Cal.App.4th at p. 835.) The arbitration process in this case, even if not perfect, was completed, and there is no basis under section 1286.2, subdivision (a)(5) to disturb it.

## IV. *No Arbitrator Misconduct.*

Lastly, the Hardimans contend the appraisal–arbitration award must be vacated, pursuant to section 1286.2, subdivision (a)(3), because the arbitrator engaged in misconduct that substantially prejudiced their rights. This misconduct, according to the Hardimans, was "repeatedly demanding evidence that she deemed to be material, and then capitulating on her demands to [their] detriment . . . ." We have already discussed this. Woodlands, through counsel, took the position that it was not required to produce this evidence. Relying on the terms set forth in the parties' engagement letter, Woodlands reasoned that: (1) the document production period was over; (2) the Hardimans could have produced, but did not produce, evidence relating to the condominium units' valuation and appraisal during the document production period; and (3) Woodlands declined to produce the evidence because the arbitrator requested valuation and appraisal information for nonoperating assets and it deemed the condominium units to be operating assets since the grocery store was run out of them. (See pp. 5–6, *ante.*)

The arbitrator implicitly accepted at least some of Woodlands's position when she issued the final report without making further requests for evidence. Under the terms of the engagement letter, had the arbitrator believed that she lacked adequate information to support the conclusions in

17

the final report, the arbitrator would have violated professional standards by providing them.[7]  However, the arbitrator did issue the report, suggesting there was indeed adequate information to support her conclusions.  We decline to override the arbitrator's judgment.  " 'Even if the arbitrator decided [the] point incorrectly, [s]he did decide it.  The issue was admitted properly before h[er].  Right or wrong the parties have contracted that such a decision should be conclusive.  At most, it is an error of law, not reviewable by the courts.' "  (*Griffith Co. v. San Diego College for Women* (1955) 45 Cal.2d 501, 515–516.)  The appraisal–arbitration award thus stands.

## DISPOSITION

The judgment is affirmed.


Jackson, P. J.


WE CONCUR:

Burns, J.
Chou, J.


A166704/*Hardiman v. The Woodlands Store, Inc.*

---

[7] As the engagement letter states:  "Our professional standards require that we base our conclusions on sufficient underlying information.  Therefore, if, in our professional opinion, we do not receive adequate information, we may not reach a conclusion.  We reserve the right to withdraw from the engagement or suspend services, if we are unable to obtain sufficient information within an adequate timeframe necessary to reach an independent conclusion."

18